# In the United States Court of Federal Claims

No. 17-836C
(Filed Under Seal:  September 12, 2017)
(Reissued for Publication:  October 12, 2017)[1]

```
*************************************
SYNERGY SOLUTIONS, INC.,            *
                                    *
            Plaintiff,              *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
*************************************
```

Postaward Bid Protest; Judgment on the
Administrative Record; <u>Blue & Gold Fleet</u>
Waiver Rule; Corporate Experience; Past
Performance; Cost Realism; Prejudice

<u>Julia Diane Di Vito</u>, Washington, DC, for plaintiff.

<u>Eric Evan Laufgraben</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this bid protest, plaintiff Synergy Solutions, Inc. ("SSI") challenges the award of a contract by the United States Department of Energy's ("DOE") National Nuclear Security Administration ("NNSA") to TUVA, LLC ("TUVA").  Currently before the court are the parties' cross-motions for judgment on the administrative record.  As explained below, because the NNSA did not act arbitrarily, capriciously, or contrary to law, the court denies SSI's motion for judgment on the administrative record and grants defendant's cross-motion for judgment on the administrative record.

---

[1]  This reissued Opinion and Order incorporates the redactions proposed by the parties in their September 26, 2017 joint status report as well as two additional redactions imposed sua sponte by court.  The court's redactions appear in lines 3 and 10 of the second paragraph on page 50; both redactions are of information the parties jointly agreed to redact but inadvertently failed to designate in their status report.  Redactions are indicated with a bracketed ellipsis ("[. . .]").  The court notes that the parties were not in complete agreement with respect to the proposed redactions, as discussed in footnote 5.

## I. BACKGROUND

### A. The Solicitation

The NNSA's mission

> is to strengthen national security through the military application
> of nuclear energy and by reducing the global threat from terrorism
> and weapons of mass destruction.  DOE/NNSA is a vital
> contributor to reducing the global nuclear danger through its
> national security, nuclear safety, nonproliferation activities, and
> nuclear materials stabilization by supporting a safe, secure, reliable
> stockpile, and the safe dismantlement and disposal of excess
> nuclear weapons.

AR 112.[2]  "The multi-disciplined DOE/NNSA safeguards and security programs . . .
directly support protection of NNSA personnel, facilities, nuclear weapons, and information
from a full spectrum of threats . . . ."  Id.  The NNSA's Office of Personnel and Facility
Clearances ("OPFC"), located on Kirtland Air Force Base in Albuquerque, New Mexico, "is
responsible for the management and implementation" of these programs.  Id.

On June 10, 2013, the NNSA prepared an Independent Government Cost Estimate
("IGCE") for the provision of "Personnel Security and Facility Clearance Programs Support
Services" over a five year period.  Id. at 1-4.  The total cost was estimated at $32,123,912.  Id. at
1.  On March 13, 2014, the NNSA developed a corresponding Acquisition Strategy Plan.  Id. at
5-11.  On February 23, 2015, the NNSA issued its Source Selection Plan ("SSP"), which set
forth "the criteria, evaluation process and procedures, and rating methodology to be used by the
Integrated Project Team (IPT) to evaluate offers for . . . Request for Proposal [("RFP") or
"solicitation")] No. DE-SOL-0006736."  Id. at 14.

The RFP was issued on February 25, 2015.  Id. at 32.  It specifically sought a contractor
to provide, on a cost-plus-fixed-fee basis, "all personnel security program support to the NNSA
clearance population of approximately 49,000 contractor and federal employees."  Id. at 33, 112-
13.  In particular, as set forth in the RFP's Performance Based Work Statement ("PBWS"), the
successful offeror would be responsible for "numerous and varied personnel security access
authorization adjudicative and processing activities, as well as investigating and analyzing the
required background investigations of approximately 8,200 clearance holders and 3,100
applicants per year."  Id. at 113; see also id. at 199 (identifying four PBWS areas:  Program
Management, Processing, Adjudication, and Foreign Ownership, Control, and Influence
("FOCI")), 214 (identifying, in the RFP Questions and Answers ("Q&A"), the six skill set
categories of Adjudication, Administrative, Processors, Professional/Executive Administrative,
FOCI, and  Vault Activities).  In addition, "OPFC conducts security reviews for approximately
9,500 human reliability program incumbents per year and performs the processing of

---

[2]  The facts in this section are derived from the corrected administrative record ("AR"),
which was filed on July 31, 2017.

investigations for approximately 4,000 applicants for [Homeland Security Presidential Directive-12 ("HSPD-12")] Personal Identification Verification per year." Id. at 113.

In section L of the RFP, the NNSA described the information that offerors were required to provide in their proposals. Id. at 86-107. Offerors were directed to submit their proposals in three volumes: Volume I: Offer and Other Documents; Volume II: Technical and Management Information; and Volume III: Cost Proposal. Id. at 94-95. Offerors were told that the information in Volumes II and III would be evaluated pursuant to five evaluation criteria: Criterion 1: Technical Approach; Criterion 2: Staffing Plan and Narrative and Program Manager ("PM") Qualifications; Criterion 3: Corporate Experience; Criterion 4: Past Performance; and Criterion 5: Cost. Id.

Then, in section M of the RFP, the NNSA indicated how the proposals would be evaluated, describing each of the five criteria. Id. at 109-11. In descending order of importance, the criteria were:

| Criterion 1 (Technical Approach) | The Government will evaluate the Offeror's understanding of the requirements, and the completeness and feasibility of the proposed technical approach associated with the PBWS requirements identified for this Criterion in Section L. The Government will also evaluate the extent to which the Offeror's technical approach demonstrates a thorough understanding of any technical risks and the effectiveness of Offeror's approach to avoid or minimize those risks. |
| --- | --- |
| Criterion 2 (Staffing Plan and Program Manager Qualifications) | (A) Staffing Plan: <br><br> The Government will evaluate the Offeror's Staffing Plan to determine the degree to which the proposed staffing levels and skill mix are likely to result in efficient and successful performance of the PBWS. Additionally, the Offeror's approach to staffing during workload fluctuations will be evaluated to determine the degree to which the approach is likely to result in continuity, and successful accomplishment of the PBWS during workload fluctuation periods. <br><br> (B) Program Manager Qualifications: <br><br> The Government will evaluate the extent to which the proposed Program Manager possesses the education and relevant experience to effectively execute the duties and responsibilities of the Program Manager considering the nature, size, and scope of the work required in the PBWS, including consideration of the Minimum Personnel Qualifications for the Program Manager position at Section J Attachment 6. The resume of the proposed Program Manager, without the documentation required in provision L.24(b)(2)(B) (if not currently employed by the Offeror), will be evaluated; however, the omitted documentation (letter of intent) will be noted as a performance risk. |
| Criterion 3 | The Government will evaluate and assess the relevancy[ ] (similarity in |

| (Corporate Experience) | nature, size in dollars, and complexity) and depth of the Offeror's (or team member's or subcontractor's) experience (provided in Attachments L-9 and L-10)[3] as it relates to performing the portions of the PBWS the Offeror (or team member or subcontractor) is proposed to perform.  Any discrepancies between Offerors' Staffing Plan and Offerors' experience listed in Attachment L-10 will be noted as a performance risk under this Corporate Experience evaluation criterion.  The Government may consider the corporate experience of a predecessor or affiliated company of a team member as though the experience were the team member's if the Government determines that the assets or resources of the predecessor or affiliated company will be brought to bear in performance under this contract.  Only corporate experience that complies with the instructions contained in provision L-24(b)(3)[, which provides, in part, that "[c]ontracts listed shall include federal customers only,"] will be evaluated. |
|---|---|
| Criterion 4 (Past Performance) | Past performance is the measure of how well the Offeror has performed work similar to that required in this solicitation.  The Government will evaluate the Offeror's (or team member's or subcontractor's) relevant information from the Past Performance Questionnaires, the self-assessment information submitted for Criterion 3, and any relevant past performance information the Government may obtain from other sources, to determine the degree to which the past performance demonstrates the Offeror's (or team member's or subcontractor's) ability to successfully perform the portions of the PBWS the Offeror (or team member or subcontractor) is proposed to perform.  Additionally, the Government will consider the Offeror's historic ability to recruit and retain personnel and ensure all required personnel are available for contract start-up.  The Government may consider the past performance of a predecessor or affiliated company of a team member as though the past performance were the team member's if the Government determines that the assets or resources of the predecessor or affiliated company will be brought to bear in performance under this contract.  Past performance information must be within the last three years and in place for at least three months in order to be evaluated.  If the Offeror (or team member or subcontractor) does not have a record of relevant past performance information on contracts similar to the PBWS, or past performance information is otherwise not available, the Offeror will not be evaluated favorably or unfavorably on past performance and will be assigned a neutral rating. |
| Criterion 5 (Cost) | The cost proposal will not be rated, but will be used in determining the best value to the Government in accordance with Section M.2 NNS-M-1002.  The cost proposal will be evaluated in accordance with [Federal Acquisition Regulation ("FAR")] 15.404 to determine cost reasonableness and realism.  A significant cost deficiency or weakness that may cause the offer to be |

---

[3] Attachment L-9 to the RFP is captioned "Corporate Experience & Self-Assessment Form." AR 197; accord id. at 95.  Attachment L-10 to the RFP is a form captioned "Corporate Experience Matrix."  Id. at 95; 199.

rejected is defined as one that is lacking in reasonableness or realism, and the correction of which would cause a material alteration or revision of the Offeror's cost proposal. An unrealistic, unreasonable, or incomplete cost proposal may be evidence of the Offeror's lack of, or poor, understanding of the requirements of the solicitation, and thus may adversely affect the Offeror's rating on the Technical Proposal criteria.

Pursuant to FAR 15.404, the following will be evaluated:

(A) <u>Reasonableness</u>:

The total price proposed for the five year period plus the Six-Month Option to Extend Services price, including the Government baselined transition period and [Other Direct Costs ("ODC")] amounts, and proposed fee will be used to evaluate price reasonableness. The cost proposal will be evaluated to determine the appropriateness of the underlying assumptions and estimating techniques used to generate the proposed costs and the consistency of those assumptions and techniques with the proposed accomplishment of the required work. The Government may use any of the cost or price analysis techniques specified in FAR 15.404-1 to determine reasonableness. The Government may determine the offer unreasonable if the Offeror's priced [Contract Line Item Numbers] are materially unbalanced.

(B) <u>Realism</u>:

The cost proposal will be evaluated to determine if the estimated proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the PBWS requirements, and are consistent with the Staffing Plan Summary submitted by the Offeror. Inconsistencies between the cost proposal and other portions of the proposal could raise concerns regarding the Offeror's understanding of the requirements and its ability to perform the work for the proposed cost, and may affect the Government's rating of the Offeror's Technical Proposal. As a result of its cost realism analysis, the Government may adjust the Offeror's proposed costs to reflect any additions or reductions in cost elements to realistic levels. Cost realism analysis will be used by the Government to establish each Offeror's total probable cost for the best value determination. The total probable cost (evaluated price) includes the sum of the Government evaluated costs of the Offeror's proposal including the Six-Month Option to Extend Services price, the Government baselined transition and ODC amounts, and total proposed fee for all requirements in the PBWS. The Offeror's cost/price proposal will be evaluated using the probable cost computed by the Government. The Offeror's proposed estimated costs shall not be controlling for source selection purposes.

Id. at 109-11 (footnote added).  According to the NNSA:

> In determining the best value to the Government, Evaluation
> Criteria 1-4, when combined, are significantly more important than
> cost/price; however cost/price will contribute substantially to the
> selection decision.  The Government is more concerned with
> obtaining a superior technical proposal than making an award at
> the lowest evaluated total cost to the Government (including fee).

Id. at 109.

In section M of the RFP, the NNSA further indicated that the contract, which was set aside for small businesses, id. at 33, would be evaluated by the NNSA's IPT, id. at 108.  The NNSA intended "to make the award without discussions."  Id.  If such an award could not be made on the basis of the offerors' initial proposals, then the RFP provided that the Contracting Officer would "establish a competitive range for proposals submitted as a result of this solicitation, comprised of all the most highly rated proposals."  Id.  Proposals were due on March 30, 2015.  Id. at 205.

## B.  SSI's and TUVA's Proposals

On March 30, 2015, the NNSA received ten proposals, id. at 2262, including proposals from SSI, the incumbent,[4] and TUVA, the eventual awardee.  See id. at 284-519 (SSI's proposal), 520-755 (TUVA's proposal).  In April 2015, the NNSA asked the Defense Contract Audit Agency ("DCAA") to perform a cost realism analysis of TUVA's cost proposal.  See id. at 4508-09 (letter regarding SAVA's cost proposal), 4513-14 (letter regarding TUVA's cost proposal), 4515-18 (DCAA memorandum regarding the NNSA's request for an analysis of Inquiries's cost proposal).

On June 30, 2016, the NNSA conducted technical evaluations of both SSI's and TUVA's cost proposals.  See id. at 861-62 (evaluation of SSI's proposal), 863-64 (evaluation of TUVA's proposal).  On July 8, 2016, the NNSA concluded, "on the basis of the [IPT's] evaluation and rating of each proposal against the evaluation criteria specified in the [RFP]," that both SSI and TUVA were in "the competitive range for the purpose of conducting discussions."  Id. at 866-67.  The NNSA separately informed SSI and TUVA, by letter dated July 28, 2016, that they were each within the established competitive range and that the NNSA had decided to enter into written discussions with them:  "The main purpose of these discussions is to notify [the offeror] of significant weakness, deficiencies, any pertinent adverse past performance information, and instances where the offeror's price is considered to be too high, or too low by the Government."  Id. at 874 (SSI's letter), 904 (TUVA's letter).  In the letters, the NNSA also informed SSI and TUVA that they were each permitted to submit a final proposal revision ("FPR") by August 12, 2016.  Id.  Both SSI and TUVA submitted timely FPRs.  See id. at 948-1457 (SSI's FPR), 1458-2135 (TUVA's FPR).

---

[4] Id. at 209.

In its FPR, SSI proposed the provision of personnel security and facility clearances support services for a total estimated cost of $26,199,522, to include both the base and option periods. Id. at 1284. SSI's total proposed price of $28,672,731 included SSI's total proposed fee (for both periods) of $1,348,209. Id. In Attachment L-9 to its FPR, SSI identified three prior contracts as evidence of its relevant corporate experience:

| Contract Number | Date & Client | Amount Invoiced to Date or Final / Initial Contract Price | Description |
|---|---|---|---|
| DE-AC52-10NA29739 | 11/17/09 NNSA | $[. . .] / $[. . .] | Incumbent contract. |
| DESC0007680 | 12/28/12 DOE | $[. . .] / $[. . .] | SSI to provide "security support services for federal personnel, prime contractors, and subcontractors." |
| DE-SC0006145 | 12/19/11 DOE | $[. . .] / $[. . .] | SSI to provide "expert and professional technical assistance to conduct facility security surveys; review security plans; review vulnerability analyses; perform Personnel Security tasks; conduct Information Security tasks; conduct Incidents of Security Concern tasks; and conduct or assist in self-assessments of all security program areas to identify deficiencies and required corrective actions." |

See id. at 1161-75 (11/17/09 contract), 1176-78 (12/28/12 contract), and 1179-80 (12/19/11 contract).[5]  In Attachment L-10 to its FPR, SSI proposed, based on its previous corporate

---

[5]  **Error! Main Document Only.**There is a well-established presumption in favor of public access to court records and proceedings.  See Nixon v. Warner Commc'ns, 435 U.S. 589, 597 (1978) ("[T]he courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); In re Violation of Rule 28(d), 635 F.3d 1352, 1356 (Fed. Cir. 2011) ("There is a strong presumption in favor of a common law right of public access to court proceedings.").  This presumption applies to court records in civil adjudicatory proceedings, AmerGen Energy Co. by & Through Exelon Generation Co. v. United States, 115 Fed. Cl. 132, 136 (2014), including the records maintained by the Court of Federal Claims, 28 U.S.C. § 174(b) (2012); Pratt & Whitney Canada Inc. v. United States, 14 Cl. Ct. 268, 273 (1988).  The presumption of public access, however, "is not absolute.  Every court has supervisory power over its own records and files, and access [may be] denied where court files might . . . become a vehicle for improper purposes."  Nixon, 435 U.S. at 598.  Thus, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."

Id. at 599.  In exercising that discretion, a court "weigh[s] the interests advanced by the parties in light of the public interest and the duty of the courts."  Id. at 602; accord AmerGen Energy, 115 Fed. Cl. at 137 ("[T]his court must weigh the private interests advanced by the parties against the public's interest in access to judicial proceedings.").  The party seeking to restrict access to court records bears a "heavy burden of overcoming the presumption of open judicial records."  Pratt & Whitney, 14 Cl. Ct. at 275.  Indeed, only a "compelling justification" will suffice to overcome the presumption.  Id. at 274; accord In re Violation of Rule 28(d), 635 F.3d at 1358 (remarking that another federal appellate court had concluded that "'only the most compelling showing can justify' limitations on the disclosure of 'testimony or documents actually introduced at trial'" (quoting Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993))); AmerGen Energy, 115 Fed. Cl. at 137 ("[A] party seeking to prevent disclosure of information submitted as evidence in dispositive judicial proceedings, whether at trial or in connection with a motion for summary judgment, must demonstrate compelling reasons for keeping such information out of public view."); see also Pratt & Whitney, 14 Cl. Ct. at 276 ("The common law right of access is particularly strong with respect to materials considered by a court.").  One circumstance in which courts will deny public access to its records is when those records contain "business information that might harm a litigant's competitive standing."  Nixon, 435 U.S. at 598.  Indeed, the protective order in this case allows for the redaction of "information that must be protected to safeguard the competitive process, including source selection information, proprietary information, and confidential information . . . ."  Protective Order ¶ 1; see also In re Violation of Rule 28(d), 635 F.3d at 1360 (noting that the court's local rule–Rule 28(d)–makes it "clear that the parties must confine their confidentiality markings [in their briefs] to information covered by a protective order"); Def. Tech., Inc. v. United States, 99 Fed. Cl. 103, 103 n.* (2011) (rejecting the proposed redaction of information that did not fall within the protective order's definition of protected information); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 519 n.* (2010) (rejecting proposed redactions "not concerning 'protected information' as defined in the protective order"); cf. Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 724 (2010) ("The purpose of redaction . . . is to safeguard the competitive process, not to withhold information that a party frowns on making public.").  However, if the redactions would be so extensive as to render the affected document incomprehensible, the court may exercise its discretion and decline to make them.  See, e.g., In re Violation of Rule 28(d), 635 F.3d at 1360 (noting that "[t]he confidentiality markings in this case were so extensive that the non-confidential version of the brief is virtually incomprehensible" and that such "an improper casual approach to confidentiality markings . . . ignores the requirements of public access[ and] deprives the public of necessary information"); Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 23 n.1 (2010) ("[I]f the court were to accept all of [the] proposed redactions, it would . . . result[] in a nearly incomprehensible public document."); MVM, Inc. v. United States, 46 Fed. Cl. 137, 137 n.* (1999) ("If the language were redacted, the opinion would be incomprehensible.").

In this case, the parties agree that the information in the third column, captioned "Amount Invoiced to Date or Final/Initial Contract Price," of the table appearing on pages 6 and 7 of the version of the opinion filed under seal should be redacted.  September 26, 2017 Joint Status Report, Proposed Redactions 6-7.  However, plaintiff also seeks to redact the information under the first, second, and fourth columns, respectively captioned "Contract Number," "Date &

experience, "100% self-performance of [the] PBWS." Id. at 1279.  SSI also provided a corporate experience matrix that identified SSI's experience in the PBWS areas of (1) Program Management, (2) Processing, (3) Adjudication, and (4) Foreign Ownership, Control, or Influence ("FOCI").  Id.

TUVA is a "privately held, wholly owned subsidiary of AKIMA, LLC,[6] which is a wholly owned subsidiary of NANA Development Corporation."  Id. at 1463-64 (footnote added). AKIMA, LLC has twenty-eight subsidiaries, id. at 3967, including SAVA Workforce Solutions, LLC ("SAVA"), id. at 1464, AKIMA Security, id. at 1862-63, and AKIMA Infrastructure, LLC, id.  In its FPR, TUVA proposed to satisfy the contract's requirements by joining forces with SAVA and another company, Inquiries, Inc. ("Inquiries").  Id. at 1463.  TUVA's total proposed price was $24,997,054, which covered both the base and option periods.  Id. at 1468.  Included in TUVA's contract price are TUVA's indirect and direct labor rates, which are described at length in its FPR.  See id. at 1675-88, 1955-56.

Lastly, TUVA's FPR provides information regarding its and its affiliates' previous corporate experience.  For example, in Attachment L-9 to its FPR, TUVA identified seven prior contracts as evidence of its relevant corporate experience:

---

Client," and "Description."  September 26, 2017 Joint Status Report 1.  According to plaintiff, the information is proprietary and if known to plaintiff's competitors, "could give [them] insight into the specific references on which [plaintiff] would rely for this type of contract."  Id.  In addition, plaintiff claims that because its "past performance and corporate experience [were] not at issue in this protest," the public does not need to have the information in order to understand the court's reasoning.  Id.  Defendant counters that the information should not be redacted because it "is publicly available and has no bearing on the competitive process."  Id. at 2.

Plaintiff's argument is not persuasive.  First, constraints that apply to federal procuring agencies and their officials do not apply to this court.  See Torres Advanced Enter. Sols., LLC v. United States, No. 17-868C, 2017 WL 4366238, at *5 (Oct. 2, 2017).  Second, allegations of competitive harm must be supported if they are to rebut the presumption of public access to court records.  See AmerGen Energy, 115 Fed. Cl. at 140-41 (noting that because broad, nebulous, or conclusory allegations of competitive harm are insufficient to establish good cause for the issuance of a protective order under Rule 26(c)(1) of the Rules of the United States Court of Federal Claims, "such allegations are insufficient to meet the more stringent compelling reasons standard required to rebut the presumption of public access with respect to judicial records").  Here, not only does plaintiff fail to specify what actions a competitor would take if it had access to information related to plaintiff's past performance, but plaintiff also fails to specify what harm would result from those actions.  In sum, plaintiff has not advanced a compelling justification for the court to redact the information described above from its September 12, 2017 Opinion and Order.

[6]  AKIMA is referred to in the administrative record as both "AKIMA" and "Akima."

| Contract Number | Date & Client | Amount Invoiced to Date or Final / Initial Contract Price | Description |
|---|---|---|---|
| HSSCCG-08-D-00009 | 4/22/08 Department of Homeland Security ("DHS") | $[. . .] / $[. . .] | Inquiries to provide "personnel security support services." |
| DJD-10-C-0014 (original)<br><br>DJD-16-R-0004 (bridge) | 12/28/09 Drug Enforcement Administration ("DEA") | $[. . .][7] / $[. . .] | SAVA to provide "qualified Project Management, Administrative, and Data Analysis Support services with the prerequisite technical and administrative knowledge, skills, and abilities to enhance the operational performance of the [DEA's Tactical Diversion Squads]." |
| JFBI-10-035 | 5/5/10 Federal Bureau of Investigation ("FBI") | $[. . .] / $[. . .] | TUVA and SAVA to provide subject matter expert services "such as investigations, adjudications, data analysis, program management, training, identifying threats to the U.S. such as foreign investments, insider threats, etc." |
| DTFAWA-14-C-00023 | 6/23/14 Federal Aviation Administration ("FAA") | $[. . .] / $[. . .] | TUVA to provide "direct support to FAA . . . in carrying out many [human resources ("HR")] program services such as compensation and benefits, work-life, talent development, business management, performance management, labor and employee relations, and regional HR services across the U.S." |
| HQ0034-14-C-0059 | 9/9/14 Department of Defense ("DOD") | $[. . .] / $[. . .] | Inquiries to provide DOD with "Adjudications and Administrative Support Services." |
| HC1028-14-P-0271 (prime contract) | 9/12/14 United States Army Office of the Provost | $[. . .] / $[. . .] | SAVA to "track and analyze metrics, as well as implement [knowledge management] to ensure [their customers] capture, develop, |

[7] [. . .].

| PO I321000013 (contract with Prime) | Marshal General ("Army OPMG") | | share, and effectively use organizational knowledge." |
| Task Order QOU OHRT201400 003 against GSA Schedule Contract GS-07F-0451Y | 9/16/14 United States Capitol Police ("USCP") | $[. . .] / $[. . .] | SAVA to provide a Project Manager with "funding for five Investigator/Adjudicators to support the USCP" Office of Human Resources. |

See id. at 1689-94 (5/5/10 contract), 1694-96 (6/23/14 contract), 1696-98 (9/16/14 contract), 1698-1701 (9/12/14 contract), 1701-03 (12/28/09 contract), 1703-05 (9/9/14 contract), and 1705-08 (4/22/08 contract) (footnote added).  In addition, in Attachment L-10 to its FPR, TUVA provided a corporate experience matrix that identified which of the various tasks identified in the four PBWS areas.  Id. at 1709-11.

On August 30, 2016, following SSI's and TUVA's submission of their FPRs, the IPT once again conducted a technical evaluation of both offerors' cost proposals.  See id. at 2136-37 (evaluation of SSI's proposal), 2138-39 (evaluation of TUVA's proposal).  On September 8, 2016, the IPT issued its final evaluation report.  See id. at 2140-210.

### C.  Initial Award and First Bid Protest

On September 28, 2016, the SSA issued her Source Selection Document ("SSD").  See id. at 2261-70.  Two days later, on September 30, 2016, the NNSA notified SSI that the contract had been awarded to TUVA.  Id. at 2274.  In its notification letter to SSI, the NNSA stated that TUVA was selected because its proposal provided the best value to the government in terms of technical merit and price, considering the RFP's evaluation criteria.  Id.  The NNSA also provided SSI with a table summarizing the NNSA's assessment of the two offerors' proposals.[8]

| | Criterion 1 (Technical Approach) | Criterion 2 (Staffing Plan & Program Manager Qualifications) | Criterion 3 (Corporate Experience) | Criterion 4 (Past Performance) | Criterion 5 (Cost) * in millions of dollars |
| --- | --- | --- | --- | --- | --- |
| TUVA | Excellent | Excellent | Good | Very Good | $24.99 |
| SSI | Good | Satisfactory | Good | Very Good | $28.67 |

Id. at 2275.  Further, the NNSA attached to its notification letter a copy of its technical evaluation of SSI's proposal that described all of the strengths and weaknesses that were

---

[8]  The table is not reproduced in its exact format.

assessed.  Id. at 2277-301.  Of particular note is the significant weakness that the NNSA assessed
for SSI's staffing plan:

> In SSI's FPR they described job duties for Adjudication Major
> Services (PBWS 4.3.1) for the Personnel Security Specialist 1 that
> does not include the [. . .].  This is not efficient and does not lend
> to proficient [. . .].  . . . [SSI's] approach does not provide the
> appropriate skill mix that is likely to result in efficient and
> successful contract performance related to all PBWS functions.
> This is a flaw in the proposal that appreciably increases the risk of
> unsuccessful contract performance.

Id. at 2288-89; accord id. at 2194-95 (containing the IPT's September 8, 2016 final evaluation
report).  In addition, the NNSA informed SSI that it was entitled to a debriefing, which meant
that SSI was permitted to submit written questions to the NNSA.  Id.  In one of its written
questions, SSI sought more information regarding the NNSA's assignment of that significant
weakness:  "In Criterion 2 – Staffing Plan & PM Quals, can the Government explain why the
Weakness discussed was considered significant?"  Id. at 2306.  In a response dated October 6,
2016, id. at 2302, the NNSA stated:  "The Government determined the proposed job duties/skill
mix in the Staffing Plan were not likely to result in efficient and successful performance of the
PBWS, and it is a flaw in the proposal that appreciably increases the risk of unsuccessful
contract performance," id. at 2306.

Less than one week later, on October 11, 2016, SSI filed a bid protest with the United
States Government Accountability Office ("GAO") challenging the NNSA's award of the
contract to TUVA.  Id. at 2310-70.  During the proceedings, the NNSA produced certain
documents, including copies of TUVA's proposal and the NNSA's evaluation of TUVA's and
SSI's proposals.  Id. at 2456-64.  In response, SSI filed a supplemental bid protest with the GAO
on November 4, 2016.  Id. at 2465-75.  On November 10, 2016, the NNSA filed a Notice of
Corrective Action and Request to Dismiss the Protest ("Notice of Corrective Action"), wherein it
indicated that it would reevaluate the acceptable offerors' proposals, review the acceptable
offerors' size qualifications, and prepare a new selection decision.  Id. at 2491; see also id. at
2534 (indicating that only the proposals evaluated by SSI and TUVA were deemed acceptable).
Then, on November 15, 2016, the NNSA clarified the scope of the corrective action:  "Should
the agency identify new weaknesses and/or deficiencies in its reevaluation of proposals that it
would have been obligated to raise in the previous round of discussions, the agency will give
acceptable offerors an opportunity to address the new weaknesses and/or deficiencies in
additional discussions."  Id. at 2524.  The following day, the GAO dismissed SSI's bid protest,
finding that the NNSA's promise to reevaluate the offerors' proposals rendered SSI's protest
academic.  Id. at 2500.

### D.  Reevaluation and Second Bid Protest

On February 22, 2017, the NNSA's IPT issued its Corrective Action Final Evaluation
Report ("Revised IPT Report").  See id. at 2521-610.  In its Revised IPT Report, the NNSA used
"the methodology described in the SSP to assess each proposal's merit in relation to the

evaluation criteria stated in the RFP." Id. at 2527.  Specifically, the NNSA compared the offerors' past experiences with the list of tasks required in the PBWS.  See id. at 2537-569 (evaluation of TUVA's FPR), 2575-604 (evaluation of SSI's FPR).  With respect to Criterion 1 (Technical Approach), Criterion 2 (Staffing Plan and Program Manager Qualifications), and Criterion 3 (Corporate Experience), the following adjectival rating definitions were applied:

| Rating | Definition |
|---|---|
| Excellent | The Proposal addresses the requirements in an exceptional manner normally evidenced by at least one significant strength or a combination of strengths and no weaknesses and a very high probability of successful contract performance with a low degree of risk. |
| Good | The Proposal addresses the requirements in a comprehensive manner normally evidenced by strengths that outweigh any weaknesses and a high probability of successful contract performance with a low degree of risk. |
| Satisfactory | The Proposal addresses the requirements in an acceptable manner normally evidenced by strengths and weaknesses that are generally offsetting and a reasonable probability of successful contract performance with a moderate degree of risk. |
| Less Than Satisfactory | The Proposal addresses the requirements in a less than acceptable manner with weaknesses that outweigh strengths, if any; and a low probability of successful contract performance with a moderate to high degree of risk. |

Id. at 2529.  With respect to Criterion 4 (Past Performance), different adjectival rating definitions were used:

| Rating | Definition |
|---|---|
| Exceptional | Performance meets contractual requirements and exceeds many requirements to the government's benefit. |
| Very Good | Performance meets contractual requirements and exceeds some to the government's benefit. |
| Satisfactory | Performance meets contractual requirements. |
| Marginal | Performance does not meet some contractual requirements.  The element being assessed reflects a serious problem for which the contractor has not yet implemented satisfactory corrective actions. |
| Unsatisfactory | Performance does not meet contractual requirements and recovery is not likely in a timely manner.  Contractor's corrective actions to date are ineffective. |
| Neutral | The Vendor lacks a record of relevant or available past performance or for whom information on past performance history is not available.  There is no expectation of either successful or unsuccessful performance based on the Vendor's past record. |

Id.  Lastly, the NNSA performed a cost realism analysis of both proposals.  See id. at 2570-74 (analysis of TUVA's FPR), 2605-06 (analysis of SSI's FPR).

The next day, February 23, 2017, the SSA issued her Revised Source Selection Decision ("Revised SSD").  Id. at 2611-19.  Significantly, the SSA concluded that there was no evidence of underbidding in TUVA's cost proposal.  Id. at 2618.  That same day, the NNSA again notified SSI that the contract had been awarded to TUVA and again provided SSI with a table summarizing its assessment of the two offerors' proposals.[9]  Id. at 2620-52.

| | Criterion 1 (Technical Approach) | Criterion 2 (Staffing Plan & Program Manager Qualifications) | Criterion 3 (Corporate Experience) | Criterion 4 (Past Performance) | Criterion 5 (Cost) * in millions of dollars |
|---|---|---|---|---|---|
| TUVA | Excellent | Excellent | Good | Very Good | $24.99 |
| SSI | Good | Satisfactory | Excellent | Very Good | $28.67 |

Id. at 2621.  According to the NNSA, "[t]he rationale for the award [to TUVA was that] TUVA's proposal represents the best value to the Government in terms of technical merit and price considering the evaluation criteria in the solicitation."  Id.  Both parties then received, as they had before, explanatory debriefing letters.  See id. at 2690-94 (TUVA's letter), 2695-98 (SSI's letter).

On March 7, 2017, SSI filed its second bid protest with the GAO.  Id. at 2699-779.  According to SSI, the NNSA (1) failed to advise SSI of a significant weakness during discussions, (2) unreasonably and unequally evaluated the proposals pursuant to Criterion 2, (3) misevaluated TUVA's proposal pursuant to Criterion 3 and Criterion 4, (4) failed to perform a proper cost realism analysis, (5) misevaluated TUVA's proposal pursuant to Criterion 1 and Criterion 2, and (6) unreasonably assigned two weaknesses to SSI's proposal pursuant to Criterion 1.  Id. at 2705-24.  On April 4, 2017, the NNSA issued its Contracting Officer's Statement of Facts and Agency Memorandum of Law.  Id. at 2838-79.

Approximately two months later, on June 15, 2017, the GAO denied SSI's protest.  See id. at 2953-67.  First, the GAO concluded that two of the protest grounds raised by SSI were untimely.  Id. at 2958-59.  They were (1) SSI's claim that "three of the contract references provided for two of TUVA's subcontractors (contracts HC1028-14-P-0271 and DJD-10-C-0014 for SAVA, and contract HSSCCG-08-D-00009 for Inquiries) are not relevant to the work required pursuant to the RFP given the lack of similarity and complexity to the work here," and (2) SSI's claim that the NNSA failed to notify it during discussions of the NNSA's assessment of a significant weakness—that SSI failed to state that its Personnel Security Specialist ("PSS") I personnel would [. . .].  Id.

Second, the GAO concluded that SSI's claim that the agency unreasonably evaluated the realism of TUVA's proposed costs lacked merit.  Id. at 2959-60.  Rather, the GAO found that (1) the NNSA was not required to perform an in-depth cost analysis, or to verify each item in assessing cost realism; (2) the NNSA was not required to achieve scientific certainty in its cost

---

[9]  The table is not reproduced in its exact format.

realism analysis; (3) the NNSA's cost realism analysis was reasonable because it used a variety of methods to evaluate the direct rates, to include a discrete analysis of labor rates by category; (4) the NNSA's determination that TUVA's "allocation of labor categories and skill mix for the tasks [was] sufficient and realistic to accomplish the PBWS" was proper; and (5) the NNSA's evaluation of TUVA's indirect rates, in light of the information provided by TUVA and the NNSA's comparison of "TUVA's proposed indirect rates with its DCAA-provided Forward Budget Submission" was appropriate.  Id. at 2960-61.

Third, with respect to SSI's argument that the NNSA's discussions with SSI and TUVA were not equal, the GAO noted that while an agency must treat offerors equally, in that "offerors must be afforded equal opportunities to address the portions of their proposals that require revision, explanation, or amplification," the actual discussions need not be "identical."  Id. at 2962.  The GAO then concluded that SSI's complaint in this respect was based on a comparison of "two very different discussion scenarios," and that overall, the NNSA's discussions with SSI and TUVA were "reasonable and equal, particularly when the content of the discussions, not just the length, are taken into account."  Id. at 2963.

Fourth, the GAO concluded that SSI's claim that the NNSA improperly assigned SSI two weaknesses for the same issue relating to its technical approach—"that [SSI's] proposal regarding risk mitigation for the OPFC did not provide an effective approach to avoid or minimize risks"—was without merit.  Id.  Noting that its review was limited to determining whether the NNSA's "evaluation conclusions were reasonable and consistent with the terms of the solicitation and applicable procurement laws and regulations," the GAO concluded that the two weaknesses were appropriately assigned because "each weakness align[ed] with a specific portion of the PBWS."  Id. at 2963-64.

Fifth, the GAO concluded that SSI's claim that the NNSA improperly gave TUVA's staffing plan a rating of "Excellent" was baseless.  Id. at 2964-65.  According to the GAO, (1) the NNSA's findings with respect to TUVA's plan and its proposed PM were amply supported by the record, and (2) the NNSA's assignment of a significant weakness only to SSI's proposal when TUVA's proposal had the same problem did not prejudice SSI because the SSA did not rely on this distinction in making her best-value decision.  Id.

Lastly, with respect to SSI's claim that the NNSA's assignment of the rating of "Good" for TUVA's corporate experience and "Very Good" for TUVA's past performance was not merited, the GAO concluded that (1) the first rating was warranted because "[a]n agency properly may attribute the experience or past performance of a parent or affiliated company," and because "the solicitation specifically allowed for the consideration of corporate experience and past performance of subcontractors," id. at 2965-66; and (2) the second rating was warranted because "the solicitation specifically stated that the agency would consider the offeror's (or team member's or subcontractor's) experience as it related to performing the portions of the PBWS that it was proposed to perform," and because the solicitation also permitted consideration of the past performance of team members and subcontractors, id. at 2966.

**E.  The Instant Protest**

Five days after the GAO denied its protest, SSI filed the instant protest.  SSI sets forth three claims for relief in its complaint.  First, SSI claims that the NNSA failed to advise it of a significant weakness during discussions.  Compl. ¶¶ 44-52.  According to SSI, the NNSA concluded that SSI's proposal contained a significant weakness pursuant to Criterion 2.  Id. ¶ 46.  SSI further avers that the NNSA then failed to notify SSI of that weakness during the discussion period:  "NNSA failed to follow the requirements of FAR 15.306(d) that a contracting officer must indicate to or discuss 'significant weaknesses' with each offeror in the competitive range and, as a result, the discussions that NNSA held with SSI were not meaningful."  Id. ¶ 49.  SSI contends that this significant weakness was material to NNSA's evaluation of SSI's proposal and ultimate decision to award the contract to TUVA.  Id. ¶¶ 48, 50.

Second, SSI claims that the NNSA's evaluation of TUVA under the corporate experience and past performance criteria was arbitrary and capricious.  Id. ¶¶ 53-63.  According to SSI, the NNSA unreasonably permitted TUVA to rely on experience references provided by TUVA and its subcontractors.  Id. ¶¶ 54-59.  Specifically, SSI claims that (1) the NNSA unreasonably permitted TUVA to rely on subcontractor SAVA's experience for an area of the contract that does not involve SAVA, and that if SAVA's experience for PBWS Area 5.0 had been properly excluded, TUVA would have been rated "Satisfactory" rather than "Good" for Criterion 3, id. ¶¶ 54-56; (2) the NNSA unreasonably found TUVA's sole experience reference and two of subcontractor SAVA's experience references to be relevant when they related to contracts that were not similar in size to the contract at issue, id. ¶ 57; and (3) the NNSA unreasonably found TUVA's sole experience reference, one of subcontractor SAVA's experience references, and one of subcontractor Inquiries's experience references to be relevant when none was performed as a federal prime contractor, id. ¶ 58.  Lastly, SSI contends in its second count that the NNSA's evaluation of TUVA under the past performance criterion was unreasonable because the NNSA considered experience that was not relevant, as relevance was defined in the RFP.  Id. ¶ 61.

Third, SSI claims that the NNSA failed to properly conduct a cost realism evaluation.  Id. ¶¶ 65-70.  According to SSI, in evaluating TUVA's proposal for cost realism, a review required by the RFP, the NNSA failed to recognize TUVA's unrealistically low direct rates and failed to adjust TUVA's probable cost on this basis.  Id. ¶ 66.  In addition, SSI contends that the NNSA failed to recognize that TUVA's indirect rates were too low to provide the employee benefits TUVA promised in its proposal and failed to adjust TUVA's probable cost accordingly.  Id. ¶ 67.  SSI also contends that the NNSA (1) failed to consider whether TUVA's technical approach was consistent with its proposed costs—according to SSI, TUVA's cost proposal was inconsistent with incumbent retention; and (2) misevaluated TUVA's staffing plan, ignored an inconsistency between TUVA's cost proposal and its technical approach, and erroneously concluded that TUVA would be capable of meeting the RFP's requirements.  Id. ¶ 68.  In SSI's view, the NNSA's cost realism analysis was insufficiently documented and there is no evidence in the contemporaneous record of a reasonable cost realism evaluation.  Id. ¶ 69.

In its request for relief, SSI claims it is entitled to a permanent injunction that requires the NNSA to:  "(i) refrain from proceeding with TUVA's contract; (ii) allow SSI to submit a new FPR addressing Criterion 2; (iii) reevaluate TUVA's proposal under the corporate experience

and past performance criteria; and (iv) conduct a proper cost realism analysis." Compl. 12.

In light of the NNSA's agreement to stay the performance of TUVA's contract for ninety days to allow for the resolution of this protest, id. ¶ 39, the court entered a scheduling order providing for the briefing of cross-motions for judgment on the administrative record. Briefing has concluded, and the court heard argument on September 12, 2017.

## II. STANDARD OF REVIEW

When entertaining a motion for judgment on the administrative record in a bid protest, the United States Court of Federal Claims ("Court of Federal Claims") reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4) (2012). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

"[C]ontracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Indeed, "technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); accord Isometrics v. United States, 5 Cl. Ct. 420, 423 (1984) ("[W]here an agency's decisions are highly technical in nature, . . . judicial restraint is appropriate and proper."). Furthermore, when engaging in a negotiated procurement, a "protester's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). And, when a contract is to be awarded on a "best value" basis, contracting officers have "even greater discretion than if the contract were to have been awarded on the basis of cost alone." Id. (citing E.W. Bliss Co., 77 F.3d at 449) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

Given the highly deferential standard of review, when a protester challenges the procuring agency's decision as lacking a rational basis, "the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." Impresa, 238 F.3d at 1332-33 (citation and internal

quotation marks omitted); accord Advanced Data Concepts, 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."). When a protester claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial." Impresa, 238 F.3d at 1333 (internal quotation marks omitted).

In addition to showing "a significant error in the procurement process," a protester must show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"); PGBA, LLC v. United States, 60 Fed. Cl. 196, 203 (2004) ("To prevail in a bid protest, a disappointed offeror must show both significant error in the procurement process and prejudice to its posture in the process."). "To establish prejudice . . ., a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote, 365 F.3d at 1351 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract."); Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protester must demonstrate that but for the alleged error, there was a 'substantial chance that [it] would receive an award—that it was within the zone of active consideration.'" (quoting CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983))); accord Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 742-43 (2000).

## III. ANALYSIS

### A. Standard for Interpreting a Solicitation

As an initial matter, the court must define the NNSA's obligation when reviewing the various proposals it received in response to its solicitation. The court interprets a solicitation in the same manner as it would a contract. See Banknote, 365 F.3d at 1353 n.4 (citing Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997-98 (Fed. Cir. 1996)). Thus, as with the interpretation of a contract, the "[i]nterpretation of the solicitation is a question of law . . . ." Id. at 1353. The court begins by examining the solicitation's plain language, and in doing so considers "the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." Id. "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; [the court] may not resort to extrinsic evidence to interpret them." Id.

However, when the language of the solicitation "is susceptible to more than one reasonable interpretation," the solicitation is ambiguous. Id. If the solicitation contains an ambiguity, then the court must determine whether that ambiguity is patent. Grumman Data Sys., 88 F.3d at 997. "A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify

the inconsistency by inquiring of the appropriate parties." Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000). Patent ambiguities are "'obvious, gross, [or] glaring.'" Grumman Data Sys., 88 F.3d at 997 (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974)). If a solicitation contains a patent ambiguity, the protester's interpretation of the solicitation will fail unless it previously sought clarification from the procuring agency regarding the ambiguous language. Id. at 997-98; accord Stratos Mobile Networks USA, 213 F.3d at 1381. If the ambiguity is not patent and the protester demonstrates that it relied upon the ambiguity, then the ambiguity will be construed against the drafter of the solicitation—the procuring agency. See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004).

## B. SSI Cannot Prevail on the Merits of Its Protest

### 1. SSI Waived Its Right to Object to the NNSA's Failure to Disclose a Significant Weakness During Discussions

SSI's first claim concerns the NNSA's failure to disclose the significant weakness pertaining to the job duties/skill mix described in the staffing plan during discussions. According to SSI, although a description of the duties of the PSS I position was present in its initial proposal, when the NNSA assigned this particular significant weakness, it only referenced SSI's FPR. Pl.'s Mot. 11 (citing AR 2194-95). SSI claims that the only change it made to its description of the duties of the PSS I position in its FPR was to add that "[t]he Personnel Security Specialists are responsible for all tasks in PBWS 4.3.1 and 4.3.2." Id. (citing AR 1235). SSI argues, therefore, that the NNSA's failure to reopen discussions to advise SSI of its assignment of a significant weakness so that SSI would have an opportunity to amend its FPR was a violation of the FAR. Id. at 13. SSI concludes: "Thus, NNSA's evaluation of SSI under Criterion 2 was flawed, and the resulting award decision based on that evaluation was unreasonable, arbitrary, and capricious." Id.

Defendant contends that SSI waived its argument that the NNSA erred by failing to engage in discussions with SSI regarding a significant weakness in its staffing plan. Def.'s Cross-Mot. & Resp. 14-18. Relying on Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), a decision of the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), defendant argues that SSI forfeited its right to challenge the NNSA's decision in this regard because SSI did not raise its objection after the NNSA's November 10, 2016 notice of its intent to take corrective action and prior to the NNSA's award of the contract to TUVA. Id. According to defendant, pursuant to the Blue & Gold Fleet waiver rule, bidders are encouraged "to raise issues early on so the agency can expeditiously address and resolve them in connection with the procurement, rather than through costly, after-the-fact litigation." Id. at 14. In addition, defendant avers that although the waiver rule was originally interpreted as applying solely to solicitations, the Federal Circuit expanded application of the rule to cover "all pre-award situations." Id. at 15 (quoting Comint Sys. Corp. & EyeIT.com, Inc., Joint Venture v. United States, 700 F.3d 1377, 1382 (Fed. Cir. 2012)). Defendant concludes: "Thus, to the extent that a bidder perceives any defect, ambiguity, or error regarding the scope of the proposed corrective action, then it must raise that concern before the agency engages in that action should it wish to preserve its objection." Id.

SSI disputes defendant's interpretation of the Blue & Gold Fleet waiver rule.  Pl.'s Reply & Resp. 2-5.  According to SSI, the waiver only applies to challenges alleging errors in the solicitation, not to challenges alleging errors in the evaluation process.  Id. at 3-4.  Quoting Vanguard Recovery Assistance v. United States, 99 Fed. Cl. 81, 92 (2011), SSI argues that "had [the agency] at any point in taking corrective action modified its solicitation and called for new proposals, then the somewhat extended doctrine of timeliness and waiver represented by the progeny of Blue & Gold Fleet in this court could well have been triggered."  Id. (internal quotation marks omitted).  In addition, SSI contends that it would have been premature for it to protest immediately following NNSA's notice that it intended to take corrective action because "the determination during the reevaluation that this aspect of SSI's proposal was a significant weakness had not yet been made."  Id. at 3 n.2.

Defendant counters that SSI's reliance on Vanguard Recovery Assistance is misplaced.  Def.'s Reply 4-5.  According to defendant, in Vanguard Recovery Assistance, the court held that the Blue & Gold Fleet waiver rule was inapplicable to the protester's challenge because it related to "perceived evaluation defects in connection with the agency's corrective action after a GAO protest," whereas in the instant case, SSI's challenge relates to a procedural error—SSI's claim that the NNSA failed to follow the requirements of FAR 15.306(d) by precluding SSI from submitting a revised FPR to address the significant weakness in its staffing plan—yet SSI failed to raise the issue prior to the NNSA's award of the contract to TUVA.  Id.  In addition, defendant challenges SSI's claim that it would have been premature for SSI to challenge the agency's corrective action because the NNSA had not yet determined whether to assign SSI's proposal a significant weakness.  Id. at 5.  Defendant claims that SSI was aware of the agency's analysis in this respect by the time it filed its first protest and certainly was aware by the time the NNSA took corrective action.  Id.

In the instant case, it is undisputed that, pursuant to the FAR, "[e]xchanges with offerors after establishment of the competitive range" are intended to be meaningful conversations between the parties:

> Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal.  These negotiations may include bargaining.  Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract.  When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

FAR 15.306(d).  Significantly, "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."  FAR 15.306(d)(3).  It is further undisputed that the NNSA failed to conduct such discussions with SSI prior to the NNSA's initial award of the contract to TUVA.  See Def.'s Cross-Mot. & Resp. 15-

16 ("[W]e recognize that NNSA did not conduct such discussions regarding a significant weakness in [SSI's] staffing plan such that [SSI] could have addressed the significant weakness in its [FPR]."); Def.'s Reply 2 ("In our cross-motion, we acknowledged that NNSA did not re-open discussions with [SSI] to address a significant weakness in its Staffing Plan (Criterion 2) that the agency identified in its evaluation of [SSI's FPR]. . . . Thus, [SSI] did not have an opportunity to address the significant weakness before the agency completed its initial evaluation of proposals.").   Nevertheless, pursuant to the <u>Blue & Gold Fleet</u> waiver rule, SSI had an obligation to object to this error in a timely fashion.

In <u>Blue & Gold Fleet</u>, the Federal Circuit affirmed the conclusion of the Court of Federal Claims that the protester's challenge to the terms of the solicitation, which was not raised until after the deadline for the submission of proposals, was untimely.  492 F.3d at 1312-16.  In doing so, the Federal Circuit recognized, for the first time, a waiver rule for bid protests:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

<u>Id.</u> at 1313; <u>accord id.</u> at 1315; <u>Bannum, Inc. v. United States</u>, 779 F.3d 1376, 1380 (Fed. Cir. 2015).  It found support for such a waiver rule in (1) the statutory mandate of 28 U.S.C. § 1491(b)(3) that courts are to "give due regard to . . . the need for expeditious resolution of" bid protests, (2) the fairness rationale underlying the doctrine of patent ambiguity, (3) the GAO's rule that challenges to the terms of a solicitation must be brought prior to the deadline for submitting bids or proposals, and (4) the analogous doctrines of laches and equitable estoppel in the patent context.  <u>Blue & Gold Fleet</u>, 492 F.3d at 1313-15.  Of these rationales for the recognition of a waiver rule, the Federal Circuit placed particular emphasis on fairness and the expeditious resolution of bid protests:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal.  If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors.  A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

<u>Id.</u> at 1314; <u>see also id.</u> at 1315 ("[T]he statutory mandate of [28 U.S.C.] § 1491(b)(3) for courts to 'give due regard to . . . the need for expeditious resolution of the action' and the rationale underlying the patent ambiguity doctrine favor recognition of a waiver rule."); <u>DGR Assocs., Inc. v. United States</u>, 690 F.3d 1335, 1343 (Fed. Cir. 2012) ("[I]f there is a patent, <u>i.e.</u>, clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit.").

The Federal Circuit revisited the <u>Blue & Gold Fleet</u> waiver rule in <u>Comint Systems</u>.  In that case, the procuring agency amended the solicitation four months after the proposal submission deadline.  700 F.3d at 1380.  More than two months later, it awarded three contracts pursuant to the amended solicitation.  <u>Id.</u>  The protester objected to the terms of the amendment, but did not lodge a protest until after the procuring agency awarded the contracts.  <u>Id.</u> at 1380-81.  Specifically, the protester lodged a protest with the GAO almost two weeks after the contracts were awarded.  <u>Id.</u> at 1380.  Then, two months later—after the GAO denied its protest—the protester filed a complaint in the Court of Federal Claims.  <u>Id.</u>

Upon review, the Federal Circuit agreed with the government that the protester failed to preserve its challenge to the terms of the solicitation amendment by not raising it prior to the award of the contracts.  <u>Id.</u> at 1381.  Although it recognized that the <u>Blue & Gold Fleet</u> waiver rule was not directly applicable to the circumstances before it because the solicitation was amended after the proposal submission deadline, the Federal Circuit concluded that the reasoning of <u>Blue & Gold Fleet</u> "applie[d] to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."  <u>Id.</u> at 1382; <u>see also id.</u> (remarking that the policy behind the <u>Blue & Gold Fleet</u> waiver rule supported the extension of the rule "to all pre-award situations").  Accordingly, it held that "assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract."  <u>Id.</u>; <u>accord id.</u> ("[W]here bringing the challenge prior to the award is not practicable, it may be brought thereafter."); <u>see also</u> <u>Bannum</u>, 779 F.3d at 1381 (holding that the protester had waived its "solicitation challenge by not properly raising it before the close of bidding" and noting that the protester had not argued that such a challenge would be "impractical" or that its failure to raise such a challenge was excusable for good cause).

In the case at bar, the issue presented is whether SSI waived its right to object to the NNSA's conceded failure to conduct discussions regarding the significant weakness in SSI's FPR.  As noted above, the GAO concluded that because SSI failed to raise the issue between September 30, 2016, the date SSI learned that it was unsuccessful in its bid, and February 23, 2017, the date the NNSA issued its Revised SSD, it waived the right to raise the issue before the GAO in its March 7, 2017 second bid protest.  <u>See</u> AR 2958-59.  The GAO focused on the fact that SSI failed to challenge the scope of the corrective action when it was discussed by the parties in several electronic-mail messages dated November 15, 2016.  <u>Id.</u> at 2958-59.  Specifically, the GAO noted that when TUVA asked the NNSA whether its corrective action would include reopening discussions, the NNSA stated:  "Should the agency identify new weaknesses and/or deficiencies in the reevaluation of proposals that it would have been obliged to raise in the previous round of discussions, the agency will give acceptable offerors an opportunity to address the new weaknesses and/or deficiencies in additional discussions."  <u>Id.</u> at 2957 (quoting the November 15, 2016 electronic-mail message from DOE to GAO).  In other words, the GAO did not find that the NNSA's decision to take corrective action was a decision to start the process anew.  Rather, the GAO viewed the NNSA's decision to take corrective action, when informed by the NNSA's electronic-mail message regarding the scope of its proposed corrective action, as a continuation of the process that began on the date TUVA was first awarded the contract.  Thus, in response to SSI's argument that "because the agency conducted a full reevaluation and made a new award decision these issues are timely filed," the GAO stated:

> The fact that the agency made a new source selection decision (and provided the offeror with a debriefing concerning that decision) does not provide a basis for reviving otherwise untimely protest allegations concerning corrective action. . . . Such unwarranted piecemeal presentation or development of protest issues undermines our goal of affording parties the opportunity to present their cases with the least disruption possible to the orderly and expeditious conduct of government procurements. . . . Accordingly, we see no reason to provide the protester here with a "second bite at the apple," nor condone a situation where an agency takes corrective action in response to a protest, and the protest then advances issues that could have and should have been raised in the previous protest.

Id. at 2959.

This court agrees with the GAO's reasoning and similarly concludes that SSI forfeited its right to claim that the NNSA failed to engage in discussions with SSI regarding its assignment of a significant weakness for SSI's staffing plan. Viewing the NNSA's evaluation of SSI's proposals as a singular process that began on March 30, 2015, the date of SSI's initial proposal, and continued until February 23, 2017, the date of the NNSA's Revised SSD, it is clear that SSI had an obligation to raise its concern over the lack of discussions in connection with its initial GAO protest—filed on October 11, 2016, or its supplemental GAO protest—filed on November 4, 2016. Thus, by the time SSI filed it second GAO protest, on March 7, 2017, SSI's protest was untimely or stale.

In so ruling, this court stresses its reliance on the Federal Circuit's expanded interpretation and application of the Blue & Gold Fleet waiver rule in Comint Systems, wherein it held that the prejudiced offeror was obliged to raise its objection to the amended solicitation as early as possible and at a minimum, prior to the agency's award of the contract:

> In summary, Comint had ample time and opportunity to raise its objections to [the amendment to the solicitation prior to the award of the contract], but chose instead to wait and see whether it would receive an award of the contract. Having done so, Comint cannot now "come forward with [its objections] to restart the bidding process," and get a second bite at the apple. . . . Comint failed to preserve its objections to [the amendment] by not raising them until after the award of the contract.

700 F.3d at 1383 (quoting Blue & Gold Fleet, 492 F.3d at 1314). Thus, the court respectfully declines to follow the reasoning in Vanguard. As noted above, in that case—which is not binding authority—the court drew a distinction between perceived defects in the solicitation versus perceived defects in the evaluation process. The undersigned does not view the reasoning of the Federal Circuit in Comint Systems as being so limited. Rather, the language in Comint

<u>Systems</u> expresses a clear, practical intent to expand the reach of the <u>Blue & Gold Fleet</u> waiver rule to include any defects that could potentially be raised and resolved prior to the contract award, despite the fact that in <u>Comint Systems</u>, the defect at issue related to an amended solicitation and not a defect arising during the evaluation process.  <u>See also</u> <u>Jacobs Tech., Inc. v. United States</u>, 100 Fed. Cl. 179, 182 n.4 (2011) ("Although [<u>Blue & Gold Fleet</u>] deals with a protester's objections to terms of the solicitation, this Court suggests that it raises legitimate concerns for prudent protesters challenging the solicitation process or the evaluation of offerors' proposals.").

## 2.  The NNSA Did Not Misevaluate TUVA's Corporate Experience and Past Performance

SSI next claims that the NNSA's evaluation of TUVA's proposal on Criterion 3 (Corporate Experience) and Criterion 4 (Past Performance) was flawed.  Pl.'s Mot. 13-14.  In SSI's view, the experience listed by TUVA was both irrelevant and inapplicable.  <u>Id.</u>  SSI advances four arguments in support of its contention that the NNSA's evaluation of TUVA's proposal was unreasonable, arbitrary, and capricious in that NNSA failed to utilize the requisite evaluation criteria.  <u>Id.</u> at 14-20.  Conversely, defendant argues that the NNSA's evaluation of TUVA's corporate experience and past performance was both rational and supported by the record, and specifically counters each of SSI's arguments.  Def.'s Cross-Mot. & Resp. 18-24.

### a.  TUVA May Rely on Its Subcontractor's Experience for Areas of the Contract the Subcontractor Will Not Perform

SSI's first argument is that TUVA cannot rely on the experience of one of its subcontractors for areas of the contract that TUVA does not intend for that subcontractor to perform.  Pl.'s Mot. 14-17.  SSI concedes that the NNSA may, pursuant to Criterion 3 and Criterion 4, "'consider [the corporate experience or past performance] of a predecessor or affiliated company of a team member as though [the corporate experience or past performance] were the team member's if [it] determines that the assets or resources of the predecessor or affiliated company will be brought to bear in performance under this contract.'"[10]  <u>Id.</u> at 14 (quoting AR 110).  SSI further concedes that the NNSA may, pursuant to these criteria, consider the experience of an offeror's team member as it relates to the portion of the PBWS the team member will be working on.  <u>Id.</u>  SSI does not concede, however, that it was appropriate for the NNSA to evaluate SAVA's experience and attribute it to TUVA when that experience was not relevant to SAVA's proposed duties pursuant to TUVA's FPR.  <u>Id.</u>

Specifically, SSI points to the NNSA's consideration of SAVA's experience pursuant to an FBI contract (contract number J-FBI-10-035).  <u>Id.</u> at 14-17 (citing AR 1689).  According to SSI, the NNSA erroneously concluded that SAVA's experience—as a result of the FBI contract—was relevant to PBWS Area 5.0, which deals with FOCI support and Facility Clearance ("FCL") support.  <u>Id.</u> at 16 (citing AR 2561-62).  In fact, SSI contends, TUVA did not

---

[10]  SSI does not challenge TUVA's claim that it is affiliated with SAVA, noting that both TUVA and SAVA are "Alaska Native Corporations" and "subsidiaries to a common parent (Akima, LLC)."  Pl.'s Mot. 15; <u>accord id.</u> ("TUVA is presumably affiliated with SAVA due to their common ownership.").

propose to the NNSA that SAVA would provide work in this area.  Id. at 15-16.  Rather, SSI claims that TUVA proposed that SAVA would provide [. . .] full time equivalent ("FTE") positions that fall into PBWS categories 4.1, 4.2, and 4.3, id. at 15 (citing AR 1886, 1974-76), and that TUVA would itself provide all of the personnel required to perform services pursuant to PBWS Area 5.0.  Id. at 16 (citing AR 1868, 1874).  This misplaced reliance, SSI argues, caused the NNSA to improperly assign TUVA a strength for having experience in all PBWS areas rather than recognizing that TUVA lacked experience providing FOCI/FCL support services and therefore merited the "Satisfactory" rating it originally received for Criterion 3.  Id. at 16-17 (citing AR 923, 2561-62).

Further, SSI claims that the "NNSA was permitted only to evaluate an offeror's corporate experience references that were provided in Attachments L-9 and L-10 that complied with the instructions contained in provision L-24(b)(3)."  Pl.'s Reply & Resp. 6.  According to SSI, the NNSA erroneously relied upon the corporate experience references of AKIMA, LLC and AKIMA Security, even though they were not listed in Attachments L-9 and L-10 to TUVA's proposal.  Id. at 6-7.

Defendant claims that the RFP permitted the NNSA to consider the resources of TUVA's predecessors and affiliates when evaluating TUVA's corporate experience.  Def.'s Cross-Mot. & Resp. 19-21.  In addition, defendant claims that TUVA was not obliged to designate its affiliates as subcontractors in order to demonstrate how their resources would support TUVA's performance of the contract.  Id. at 19.  According to defendant, TUVA's only obligation was to demonstrate how resources such as the workforce, management, or facilities of its affiliates would be committed to the contract.  Id.  Furthermore, in response to SSI's contention that the NNSA improperly considered SAVA's experience because TUVA's proposal did not indicate that a SAVA employee was to provide FOCI/FCL support, defendant argues that the RFP allowed the NNSA to consider both SAVA's assets and resources as well as its employees.  Id. (citing AR 110).  Finally, defendant notes that when the GAO considered these same arguments, it found "no basis to question [the NNSA's] determination."  Id. at 21 (quoting AR 2966).

Then, in response to SSI's claim that it improperly considered corporate experience references that did not comply with the terms of the RFP in that they were not listed in Attachments L-9 and L-10, defendant notes first that "[a]lthough SAVA is both TUVA's subcontractor and affiliate, the agency considered TUVA's explanation of the assets and resources that SAVA would contribute to FOCI/FCL work as an affiliate."  Def.'s Reply 7 (citing AR 1843, 2562).  Second, defendant notes that TUVA's FPR included an updated version of Attachment L-9, which contained additional information regarding SAVA's corporate experience.  Id. (citing AR 1843).  Third, defendant notes that TUVA's FPR explained that not only did AKIMA, LLC have specific FOCI/FCL experience, but that AKIMA, LLC would provide TUVA with access to its Facility and Corporate Security Officer in addition to providing financial and administrative resources.  Id.

Pursuant to Criterion 3 of the RFP, an offeror's corporate experience may be evaluated in two ways.  First, the NNSA stated that it "will evaluate and assess the relevancy . . . and depth of [the offeror's or its team member's or subcontractor's] experience  . . . as it relates to performing

the portions of the PBWS [the offeror proposes that it or its team member or subcontractor is] to perform." Id. at 110 (emphasis added).  In other words, the NNSA was obliged to consider the corporate experience of TUVA or its team members or subcontractors if it was related to PBWS tasks that TUVA proposed it or they would perform.  Second, the NNSA stated that it "may consider the corporate experience of [a predecessor or affiliated company] as though the experience [was the offeror's if the NNSA] determines that the assets or resources of the predecessor or affiliated company will be brought to bear in performance under this contract." Id. (emphasis added).  In other words, with respect to TUVA's predecessors or any companies affiliated with TUVA, the NNSA was permitted, but not obliged, to consider the entity's assets or resources as belonging to TUVA if they would be brought to bear in the performance of the contract.

TUVA's FPR provided that in addition to the work performed by TUVA, work would be performed by SAVA and Inquiries, acting as subcontractors.  See id. at 1458-66.  TUVA also indicated in its FPR that SAVA possessed significant FOCI/FCL experience as a result of work on a particular FBI contract.  See AR 1843-48.  In addition, TUVA indicated in its FPR that it would receive security support, to include its Facility and Corporate Security Officer, from AKIMA, LLC, its parent company.  Id. at 1862-63.  TUVA also described, for the first time in its revised Attachment L-9, in section captioned "Additional Corporate Experience," its ability to rely on the expertise of AKIMA Security:

> Additionally, AKIMA Security has experience supporting one of our sister companies, AKIMA Infrastructure, LLC, that provides support to the Sandia National Laboratory and the Lawrence Livermore Laboratories, so they are familiar with the DOE's processes and procedures.  AKIMA Security has expertise, knowledge, and skills affecting the Foreign Ownership, Control, or Influence Program (FOCI).

Id.  In its revised Attachment L-9, TUVA also modified its description of the work performed by SAVA on the FBI contract, further highlighting TUVA's ability to satisfy the FOCI/FCL requirements of the instant contract.  See id. at 1843-44 ("SAVA has developed a breadth of experience in identifying, investigating, analyzing, and assessing both individuals and entities with any foreign nexus and its impact on Security and the US Intelligence Community through its extensive work on multiple FBI/[Subject Matter Expert ("SME")] Contract Task Orders, such as the Security Division, Counterintelligence and Directorate of Intelligence. . . . TUVA/SAVA believes this extensive experience with analytical and investigative work on both individuals and other entities by their SMEs, coupled with their knowledge and ability to adhere to agency regulations, policies and procedures, mitigates the lack of specific corporate experience pertaining to the PBWS FOCI/FCL Task (5.0)."), 1862-63 ("TUVA receives security support, to include our Facility and Corporate Security Officer, from our parent company, AKIMA, LLC, that provides these services for all of its subsidiary companies.  Additionally, AKIMA Security has experience supporting one of our sister companies, AKIMA Infrastructure, LLC, that provides support to the Sandia National Laboratory and the Lawrence Livermore Laboratories, so they are familiar with the DOE's processes and procedures.  AKIMA Security has expertise, knowledge, and skills affecting the Foreign Ownership, Control, or Influence Program

-26-

(FOCI).”), 1863 (“Acknowledging the DOE has its own processes and procedures for FOCI, Team TUVA is confident our reach back to our experienced security staff coupled with the knowledge gained from our experience investigating foreign ownership, influence, and threats to our national security through our FBI SME contract will assist us in fully executing the requirements of the PBWS and any resulting contract.  Additionally, based on our experience successfully staffing contracts with existing incumbent personnel, our team is confident we will be able to retain the existing FOCI/FCL knowledge base.”).

In evaluating TUVA’s corporate experience pursuant to the RFP’s evaluation criteria, the IPT, in its Revised IPT Report, explained:

> TUVA provided Corporate Experience that is somewhat relevant for FOCI/FCL PBWS (5.0).  TUVA/SAVA had SME[s] that supported the FBI counterintelligence and Counterespionage missions.  The SME[s] gained experience in research to determine if foreign influence was present and posed a threat to security.  SME[s] supported the identification, analysis and dissemination of information regarding threats to national security as a result of foreign investments/ownership in the US.  This included reviewing applications with information related to newly acquired foreign acquisitions, foreign ownership or influence.  TUVA’s general knowledge/expertise will assist in performing some of the necessary services to the FOCI/FCL PBWS.

Id.  Then, in her Revised SSD, the SSA explained:

> TUVA received a “Good” rating for Corporate Experience.  Cumulatively, TUVA and their subcontractors provided Corporate Experience for each of the PBWS areas.  TUVA provided Corporate Experience that was highly relevant for Program Management, Processing and Adjudication, and somewhat relevant for FOCI/FCL.  As a result, TUVA demonstrated depth of experience, as it relates to performing the PBWS and increases the likelihood of successful contract performance. Overall, TUVA received 3 significant strengths, 1 strengths and no weaknesses.

Id. at 2617.  In addition, in an internal memorandum captioned “Ostensible Subcontracting Review,” which was prepared by the NNSA during the corrective action, not only did the NNSA indicate that FOCI/FCL experience was only relevant to a small part of the work pursuant to the contract, but the NNSA also stated that “[e]ven if SAVA’s Corporate Experience and Past Performance contracts had been removed from consideration under the criteria of the same name, TUVA would still have been able to demonstrate Corporate Experience in three of the four task areas and highly rated Past Performance.”  AR 2688.  Furthermore, in a footnote to this statement, the NNSA added:

> Between TUVA and Inquiries, similarly situated small businesses
> under the NAICS for this procurement, only experience under the
> [FOCI] task area would have been lacking.  This is a relatively
> small scope of the work under this requirement for [which] both
> TUVA and SSI proposed only 3 FTEs.  At worst, TUVA would
> have received a "Satisfactory" rating like other Offerors who were
> missing experience in one area . . . , including [in] more significant
> scope areas of performance.  With respect to Past Performance,
> between TUVA and Inquiries, there was highly rated Past
> Performance such that it is unlikely the rating assigned of "Very
> Good" would have been different.

Id.  In sum, the NNSA assessed TUVA's corporate experience, which included SAVA's "somewhat relevant" experience, in accordance with the evaluation criteria in the RFP.  Its assessment, therefore, was not irrational.

Finally, the court notes that although defendant's description of the GAO's conclusion regarding the NNSA's assessment of TUVA's corporate experience is accurate, it is irrelevant:

> When the GAO denies a bid protest, and finds the agency decision
> reasonable, the GAO decision drops out of the equation when a
> subsequent protest is brought in our court.  See Data Mgmt. Servs.,
> J.V. v. United States, 78 Fed. Cl. 366, 371 n.5 (2007) (explaining
> that the GAO decision "is given no deference"); All Seasons
> Constr., Inc. v. United States, 55 Fed. Cl. 175, 177 n.1 (2003).  The
> Court is not aware of any Federal Circuit opinions in which the
> GAO's seal of approval brings with it any enhanced deference
> toward the agency decision—after these opinions note the GAO's
> denial of a protest, the GAO decisions do not figure into the
> Circuit's analysis.  See, e.g., Ala. Aircraft [Indus., Inc.-
> Birmingham v. United States], 586 F.3d [1372,] 1374-76 [(Fed.
> Cir. 2009)]; Axiom Res. Mgmt.[, Inc. v. United States], 564 F.3d
> [1374,] 1378, 1381-84 [(Fed. Cir. 2009)]; Tip Top Constr., Inc. v.
> United States, 563 F.3d 1338, 1341-47 (Fed. Cir. 2009); Info.
> Tech. [& Applications Corp. v. United States], 316 F.3d [1312,]
> 1317, 1319-24 [(Fed. Cir. 2003)].  In the admittedly rare case in
> which the GAO sustains a protest but the agency chooses not to
> follow that office's recommendation, it seems the agency's initial
> procurement decision (not the decision to eschew the
> recommendation) would be the topic of a resulting bid protest in
> court, and the deference given the agency's decision is not reduced
> due to the GAO's disagreement.  See Delta Data Sys. Corp. v.
> Webster, 744 F.2d 197, 201-02 (D.C. Cir. 1984) (Scalia, J.)
> ("regard[ing] the assessment of the GAO as an expert opinion,
> which we should prudently consider but to which we have no
> obligation to defer" and "reject[ing the] contention that every

decision of the GAO should be adopted and enforced by the court
unless that decision lacks a rational basis").

CBY Design Builders v. United States, 105 Fed. Cl. 303, 339-40 (2012).

### b. The NNSA's Assessment of TUVA's Corporate Experience Was Neither Arbitrary Nor Capricious

Second, SSI claims that three of the experience references TUVA provided the NNSA were not relevant pursuant to the terms of the RFP because they related to contracts that were not similar in size to the one described in the RFP.  Pl.'s Mot. 17-18 (citing AR 110).  According to SSI, the first such contract is a subcontract TUVA performed for Lynxnet, LLC in support of the FAA (contract number DTFAWA-14-C-00023), which was valued by TUVA at $240,098.50.  Id. at 17 (citing AR 1695).  Because TUVA proposed to perform the current contract for nearly $25 million, SSI argues that the FAA contract cannot be considered pursuant to Criterion 3 or Criterion 4 since it is not similar in "size in dollars" to the contract contemplated by the RFP.  Id. (citing AR 1933).

The other two experience references challenged by SSI are for contracts performed by SAVA, TUVA's subcontractor.  Id.  The first is SAVA's contract with the USCP (contract number QOU-OHRT201400003), which was valued at $[. . .].  Id. (citing AR 1697).  The second is SAVA's contract with the Army OPMG (contract number HC1028-14-P-0271), which was valued at $[. . .].  Id. (citing AR 1698).  SSI contends that these contracts, like TUVA's FAA contract, are irrelevant pursuant to Criterion 3 and Criterion 4 and should not have been considered by the NNSA.  Id. at 17-18.

In addition to challenging the relevance of TUVA's experience references, SSI contends that the NNSA failed to explain why it deemed contracts with much lower values—such as $[. . .]—similar in "size in dollars" to the solicited contract, which was valued at more than $32 million.  Pl.'s Reply & Resp. 8-9.  According to SSI, "[w]here the agency lacks a coherent and reasonable explanation of its evaluation of proposals, the Court cannot ascertain whether the agency's evaluation had a reasonable basis," and therefore "the Court cannot find that deeming these contracts relevant was proper."  Id. at 9.

Defendant argues that TUVA's proposal included relevant corporate experience.  Def.'s Cross-Mot. & Resp. 21-22.  Noting that an agency's "'determination of relevance is owed deference as it is among the minutiae of the procurement process which [courts] will not second guess,'" id. at 21 (quoting Glenn Def.  Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 909 (Fed. Cir. 2013)), defendant claims that SSI "attempts to impose a restriction on the agency's discretion to determine relevance where none exists," id.  According to defendant, the RFP does not define relevant contracts as those similar in dollar value.  Id.  In addition, defendant avers that the NNSA's evaluation of SSI's corporate experience included the consideration of four contracts that had a dollar value of less than ten percent of the instant contract.  Id. at 21-22.  Lastly, defendant states that the NNSA's decision to interpret the phrase "similar in size" broadly was appropriate given that the contract was set aside for a small business.  Id. at 22 (citing AR 7).

In response to SSI's contention that the NNSA failed to provide any explanation of its analysis with respect to the relevance of these smaller contracts, defendant claims that the NNSA's "key relevance consideration was the 'degree of similarity between the experience proposed to the work required by the [PBWS].'"  Def.'s Reply 9 (quoting AR 2555).  In addition, defendant notes that the NNSA performed an "item-by-item comparison of tasks required by the [PBWS] with specific experience obtained by TUVA (or its subcontractors)."  Id. (citing AR 2556-61).

The NNSA was required, pursuant to the corporate experience criterion of the RFP, to "evaluate and assess the relevancy[ ] (similarity in nature, size in dollars, and complexity) and depth of the Offeror's (or team member's or subcontractor's) experience (provided in Attachments L-9 and L-10) as it relates to performing the portions of the PBWS the Offeror (or team member or subcontractor) is proposed to perform."  AR 110.  Furthermore, pursuant to the past performance criterion of the RFP, the NNSA was required to assess "how well the Offeror has performed work similar to that required in this solicitation."  Id.  The RFP does not define, either in its descriptions of the criteria to be considered or anywhere else, what it means for an offeror's corporate experience or past performance to be similar in nature, dollar value, or complexity.  The issue therefore is whether the NNSA's consideration of contracts that ranged in dollar value from approximately $[. . .] to approximately $[. . .] was reasonable in light of the fact that TUVA offered to perform the instant contract for approximately $25 million.  The answer is yes.

As defendant aptly notes, the NNSA's discretion in this area is broad.  See, e.g., Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 718 (2010) ("Thus, when evaluating an offeror's past performance, the SSA 'may give unequal weight,' or no weight at all, 'to different contracts when the SSA views one as more relevant than another.'" (quoting SDS Int'l, Inc. v. United States, 48 Fed. Cl. 759, 769 (2001))); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 539 (2010) ("At the outset, it is important to note that what does or does not constitute 'relevant' past performance falls within the SSA's considered discretion.").  In fact, in its Revised IPT Report, the NNSA clearly states—in the context of evaluating an offeror's corporate experience—that it broadly construed relevancy:

> Relevancy was met if the work[ ] was similar in nature, meaning similar to portions of the work required under the PBWS; if the complexity of the Corporate Experience was related and aligned o portions of the work required under the PBWS; and if the size in dollars proposed to perform was similar (applied with broad discretion).  The thresholds of relevancy are based on the degree of similarity between the experience proposed to the work required by the PBWS.

AR 2555 (emphasis added).

The NNSA's application of this standard to TUVA's corporate experience—specifically the NNSA's awarding TUVA three significant strengths for its corporate experience pursuant to Criterion 3—reflects this broad approach.  Id. at 2557-62.  For example, the NNSA began its

discussion of the first significant strength by stating that TUVA provided highly relevant corporate experience for program management.  Id. at 2557.  Next, the NNSA described the tasks performed by TUVA, its affiliates, and its subcontractors.  Id.  Regarding TUVA/SAVA's corporate experience in one aspect of program management, the NNSA concluded:

> TUVA/SAVA conducted studies and analyses directed by the government.  They identified efficiencies in program processes and determined which recommendations would be implemented.  They assisted and conducted training for the government and developed presentation and training materials in the oversight of training deliverables.  They provided coaching and advisory services to achieve improvement in functions and operations.  Their PM interfaced with the [contracting officer] on a regular basis, as well as the Contracting Officer Technical Representative (COTR).  The PM managed all phases of the subject matter expert's work flow, quality and program deliverables.  The PM provided risk assessment and maintained accountability for quality assurance/quality control schedules, cost and contract performance.  The PM prepared monthly invoices and formal status reports/meeting for the FBI COTR.  Contract # J-FBI-10-035

Id.  Therefore, that the NNSA considered contracts that were not performed solely by TUVA does not render the agency's evaluation in this regard arbitrary or capricious.

In addition to the NNSA's broad discretion to assess the relevancy of an offeror's corporate experience, the NNSA also has broad discretion to determine whether an offeror's previous contracts are similar in "size in dollars" to the solicited contract.  For example, in the three PBWS areas of Program Management, Processing, and Adjudication, the NNSA relied upon Inquiries' $[. . .] DOD prime contract and Inquiries' $[. . .] million DHS first level subcontract.  See id. at 2556-57.  In doing so, the NNSA did not merely acknowledge that Inquires had experience in those areas, but it specifically identified the tasks performed.  Thus, in the area of Program Management, the NNSA wrote the following regarding Inquiries' work on the DOD contract:

> Inquiries developed and maintained quality control plans.  They were responsible for the overall management of the contract and personnel.  They handled report generation and analysis, briefings, compiling training manuals and work instructions and SOP documents.  They ensured all personnel were fully trained and qualified to meet or exceed the government's timeliness standards, quality standards and deliverables.  They were responsible for the execution of all tasks, program management and subcontractor management.

Id. at 2558.  The NNSA also provided the following comment regarding Inquiries's work on the DHS contract:  "Inquiries provided direct customer service and quality control.  Their active site-

lead oversaw day-to-day operations of contractor staff, who directly supported operations within the Personnel security Division." Id.  Therefore, that the NNSA considered contracts that were less than 10% of the solicited contract does not render the agency's evaluation in this regard arbitrary or capricious.

### c.  SSI Was Not Prejudiced by the NNSA's Consideration of TUVA's Experience on Projects Where TUVA Was Not the Prime Contractor

Third, SSI complains that three of the experience references TUVA lists in its proposal were not relevant pursuant to Criterion 3 and Criterion 4 because TUVA was not the prime contractor on those contracts.  Pl.'s Mot. 18-19.  SSI notes that the RFP stated that an offeror's corporate experience contracts "'shall include federal customers only.'"  Id. at 18 (quoting AR 98).  In addition, SSI notes that during the RFP Q&A period, the NNSA clarified that activities performed "in accordance with federal regulations"—to include "work for other subcontractors and [Maintenance and Operations ("M&O")] contractors that support DOE/Federal facilities"—would not be considered.  Id. (quoting AR 210).  Thus, SSI concludes, only experience references in which TUVA acted as the prime contractor to a federal government agency may be considered, id., and therefore, the NNSA should not have considered the following contracts in its assessment of TUVA's proposal:  (1) contract number DTFAWA-14-C-00023, because TUVA acted as a subcontractor pursuant to Lynxnet's prime contract with the FAA, id. (citing AR 98); (2) contract number POI321000013, because SAVA acted as a subcontractor pursuant to another entity's prime contract with the Army OPMG, id. (citing AR 795, 1698); and (3) contract number HSSCCG-08-D-00009, because Inquiries acted as a subcontractor pursuant to Alutiiq Business Services, LLC's prime contract with the DHS, id. at 18-19 (citing AR 802, 1706).

Defendant claims that the RFP permits consideration of experience obtained by the offerors and their subcontractors as both prime and subcontractors on federal contracts.  Def.'s Cross-Mot. & Resp. 22-23.  According to defendant, SSI misinterprets the NNSA's response during the Q&A period.  Id. at 22.  Defendant contends that when the NNSA answered "no" to a request to allow consideration of "all activities that are in accordance with federal regulations to include commercial facilities that are governed under [DOE] guidelines and work for other subcontractors and M&O contractors that support DOE/Federal facilities," id. at 22 (quoting AR 210), it only intended to preclude consideration of insufficiently relevant work experience, e.g., work experience that complied with DOE/Federal guidelines for commercial facilities, id. at 22-23.  In defendant's view, "[t]he RFP—and evaluation—focused on the relevancy of the experience, not the offeror's role as the prime contractor or subcontractor."  Id. (citing AR 110, 2555-62).  Defendant further claims that "TUVA's proposal does not rely on contracts with commercial facilities, other subcontractors, or M&O contractors."  Def.'s Reply 10.

As SSI contends, the RFP provides that, when completing Attachment L-9, the "Corporate Experience & Performance Self-Assessment Form," offerors were instructed to list contracts that "include federal customers only."  AR 98.  However, the RFP does not indicate whether those contracts may only be ones in which the offeror acted as the prime contractor or whether federal contracts for which the offeror acted as the subcontractor may be listed as well. Because this provision within the RFP "is susceptible to more than one reasonable interpretation," Banknote, 365 F.3d at 1353, the solicitation is ambiguous.  Therefore, the court

must determine whether that ambiguity is latent or patent.  See Grumman Data Sys., 88 F.3d at 997.  In this case, SSI was not presented with "facially inconsistent provisions," Stratos Mobile Networks USA, LLC, 213 F.3d at 1381, which would have placed it on notice and prompted it to make inquiries.

That said, based on the plain language of the Q&A exchange concerning relevant experience, it is clear that all offerors received clarification from the NNSA that (1) activities relating to commercial facilities governed by DOE guidelines would not be considered, and (2) work for other subcontractors and M&O contractors in support of DOE/Federal facilities would not be considered.  Thus, despite defendant's claim that the NNSA only intended to preclude consideration of work performed on commercial facilities, the NNSA actually precluded consideration of two types of experience:  work for commercial facilities and "work for other subcontractors and M&O contractors in support of DOE/Federal facilities."  AR 210.  Thus, the Q&A exchange does not clarify the latent ambiguity.

The next question is whether SSI relied on the ambiguity.  See NVT Techs., 370 F.3d at 1162.  On this point, the record is unclear.  Although SSI does not explicitly state that it relied on the ambiguity, it did not list any contracts on its "Corporate Experience & Performance Self-Assessment Form," in which it was the subcontractor.  See id. at 1161-80.  In any event, even if SSI relied on the ambiguity, and the ambiguity must therefore be construed against the NNSA, SSI has not shown that it was prejudiced by such reliance.  In other words, without more, SSI cannot argue that TUVA's receipt of a "Good" rating with respect to its corporate experience, as compared to SSI's receipt of an "Excellent" rating, was sufficiently prejudicial to SSI such that the NNSA's decision to award the contract to TUVA must be deemed arbitrary, capricious, and without basis.  Moreover, SSI cannot argue that absent this error in the NNSA's evaluation of the various proposals, SSI would have been awarded the contract.

**d.  The NNSA Did Not Misevaluate TUVA's Past Performance Pursuant to Criterion 4**

Finally, SSI argues that the NNSA misevaluated TUVA's past performance pursuant to Criterion 4.  Pl.'s Mot. 19-20.  Specifically, SSI contends that the NNSA's assessment was flawed because it erroneously deemed all of TUVA's and its subcontractors' experience references relevant, even though three of the contracts—one of TUVA's and two of SAVA's— were not relevant.  Id.  This led, SSI avers, to the NNSA improperly assigning TUVA three strengths for Criterion 4 when it should only have assigned two—one strength for its past performance and one strength for its ability to recruit and retain personnel.  Id. (citing AR 2563-69).  SSI concludes:

> These errors impacted the evaluation of offerors and the final
> tradeoff decision, as SSI was assigned a rating of Very Good under
> Criterion 4 based on its having one significant strength, three
> strengths, and no weaknesses, including receiving Exceptional and
> Very Good ratings on the incumbent contract.  It is likely that,
> without three of its assigned strengths, TUVA would not be
> viewed as favorably when the offerors were compared, and TUVA
> would be found to be Satisfactory instead of Very Good under

Criterion 4.

Id. at 20 (citation omitted).

Defendant argues that the NNSA's evaluation of TUVA's past performance was rational. Def.'s Cross-Mot. & Resp. 23-24.  First, with respect to SSI's contention that TUVA should have received a "Satisfactory" rather than a "Very Good" rating because three of the contracts the NNSA considered were not relevant, defendant contends that SSI fails to acknowledge the broad discretion afforded the agency.  Id.  Second, with respect to SSI's claim that the NNSA considered TUVA's past performance on contracts that were smaller in size and value, defendant counters that despite the differences, these contracts were nevertheless still relevant.  Id. at 24 (citing AR 2567).  Third, defendant claims that the RFP does not, as SSI asserts, prohibit consideration of work TUVA performed for a federal agency as a subcontractor.  Id.  Finally, defendant argues that SSI has not offered any concrete evidence to support its contention that the NNSA's assessment of TUVA's past performance ultimately affected its best value trade-off decision.  Id.  In the NNSA's view, not only was SSI afforded an advantage in the category of past performance, but even if SAVA's experience had not been considered, TUVA and Inquiries were rated highly for past performance and thus it is likely that TUVA's past performance would still have been rated "Very Good."  Id. (citing AR 2688).

SSI quarrels with defendant's conclusion that it is unlikely that errors in the NNSA's assessment of TUVA's past performance affected the ultimate award decision.  Pl.'s Reply & Resp. 11-12.  According to SSI, defendant's argument "ignores that the RFP provided for a best value analysis, where the evaluation factors were more important than price, but as technical proposals became close or similar in merit, the evaluated cost is more likely to be a determining factor."  Id. (citing AR 109).  Thus, SSI contends that if the NNSA ultimately concluded that SSI's proposal was superior to TUVA's proposal with respect to past performance, "the magnitude of that superiority is critical to the best value tradeoff."  Id. at 12.

Because SSI's arguments regarding NNSA's evaluation of TUVA's proposal under Criterion 4 mirror those SSI advanced with respect to Criterion 3, the court's analysis of those arguments is also the same.  See Section III.B.2.b-c, supra.  In a nutshell, not only did the NNSA possess broad discretion to evaluate TUVA's and SSI's past performance, to include the consideration of contracts smaller in size and value than the instant contract, but more importantly, SSI has once more failed to offer any evidence that but for the NNSA's consideration of TUVA's and its subcontractor's experience references, SSI would have been awarded the contract.  As noted in the RFP, "[i]n determining the best value to the Government, Evaluation Criteria 1-4, when combined, are significantly more important than cost/price . . . . The Government is more concerned with obtaining a superior technical proposal than making an award at the lowest evaluated total cost to the Government (including fee)."  AR 109.  Thus, although SSI suggests that TUVA's receipt of a lower rating for past performance would have affected the outcome of the NNSA's calculus, such a broad statement cannot be made in this case, given the NNSA's use of a trade-off analysis.  In other words, even if TUVA had only received a "Satisfactory" rating pursuant to Criterion 4, it still would have received higher ratings in three of the four criteria (Criterion 1, Criterion 2, and Criterion 5), two of which were deemed more important than Criterion 4.  Lastly, although SSI's contention regarding the

significance of the magnitude of SSI's superiority in the area of past performance is sound, it is no substitute for concrete evidence that but for TUVA's receipt of a "Very Good" rating in this category, SSI would have been awarded the contract.

### 3.  The NNSA's Cost Realism Analysis Was Rational

Plaintiff's final claim concerns the NNSA's cost realism analysis.  The contract that the NNSA sought to award is a cost reimbursement contract.  Thus, as noted above, the RFP required a cost realism analysis "to ensure that the final agreed-to price is fair and reasonable."  FAR 15.404-1(a).  A cost realism analysis is

> the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

FAR 15.404-1(d)(1).  Agencies tasked with performing such an analysis must make appropriate probable cost adjustments such that an offeror's proposed cost best reflects the estimated cost of performance.  FAR 15.404-1(d)(2)(i).  Thus, agencies must consider "the information available" and must "not make 'irrational assumptions or critical miscalculations.'"  Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 509 (2005) (quoting OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000)).  In addition, agencies must "make a good faith effort to consider material facts that a reasonably prudent person would consider relevant to the procurement decision."  United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003).

To overturn an agency's cost realism determination, a protester must establish that the agency's decision lacked a rational basis.  JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 393 (2001); see also CTA, Inc. v. United States, 44 Fed. Cl. 684, 693 (1999) ("'Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis.'" (citation omitted)).  While an agency's cost realism analysis need not have been performed with "impeccable rigor" to be rational, OMV Med., 219 F.3d at 1344, the analysis must reflect that the agency considered the information available and did not make "irrational assumptions or critical miscalculations."  Id.; see also United Payors & United Providers Health Servs., 55 Fed. Cl. at 329 ("'Because the agency is in the best position to make this cost realism determination, our review is limited to determining whether its cost evaluation was reasonably based and not arbitrary.'" (citation omitted)).  Finally, in the context of a best value procurement, the court's consideration of an agency's decision is particularly deferential.  See Galen Med. Assocs., 369 F.3d at 1330.

Because "contracting officers are vested with wide discretion with regard to the evaluation of bids," Labat-Anderson, Inc. v. United States, 42 Fed. Cl. 806, 846 (1999), and are entitled to "broad discretion . . . to determine whether a proposal is technically acceptable, [a]

plaintiff has an unusually heavy burden of proof in showing that the determination made in this regard was arbitrary and capricious." Cont'l Bus. Enters. v. United States, 452 F.2d 1016, 1021 (Ct. Cl. 1971).

According to SSI, the NNSA neglected to perform a reasonable cost realism analysis of TUVA's proposal. Pl.'s Mot. 20-34. SSI advances four arguments in support of its contention. Id. Defendant counters that the NNSA's cost realism analysis had a rational basis. Def.'s Cross-Mot. & Resp. 25-35. According to defendant, because the NNSA was given broad discretion to devise its own methodology for analyzing cost proposals, the court's review therefore is necessarily "'very narrow.'" Id. at 25 (quoting McConnell Jones Lanier & Murphy LLP v. United States, 128 Fed. Cl. 218, 236 (2016)). Defendant also urges the court to give prudent consideration to the GAO's conclusion that the NNSA's cost realism analysis was reasonable and supported by the record. Id. at 26 (citing AR 2959-61 and McConnell Jones Lanier & Murphy, 128 Fed. Cl. at 236 n.9). For the reasons set forth below, plaintiff fails to meet its burden.

### a. The NNSA's Evaluation of TUVA's Direct Labor Rates Was Rational

First, SSI avers that the NNSA failed to appropriately account for what SSI characterizes as TUVA's unrealistically low direct labor rates. Pl.'s Mot. 22-26. Specifically, SSI contends that the NNSA should have realized that TUVA's proposed price was much too low to support the technical approach described in TUVA's proposal. Id. In support of its position, SSI argues that a simple comparison of the direct labor rates proposed by SSI with those proposed by TUVA, for [. . .] labor categories, demonstrates that TUVA's proposed direct labor costs are [. . .]% lower than SSI's. Id. at 23. SSI also suggests that the NNSA should have appreciated that TUVA's commitment to retaining a minimum of [. . .]% of the incumbent personnel, AR 1679, at comparable labor rates, id. at 2017, was inconsistent with TUVA's concurrent promise of low direct labor rates. Pl.'s Mot. 23-24. According to SSI, "[i]t is well-established that a cost realism analysis requires consideration of whether the offeror's proposed cost reflects a clear understanding of the requirements to be performed, and is consistent with the unique methods and materials described in the offeror's technical proposal," id. at 24 (citation omitted), and although the NNSA appropriately concluded "that TUVA's rates were too low to retain [. . .]% of the incumbent workforce, the NNSA did not assign a weakness," id. (citing AR 2573). Had the NNSA conducted a reasonable cost realism analysis, SSI adds, the NNSA would have made a probable cost adjustment instead of simply accepting TUVA's low proposed direct labor rates. Id. at 25-26 (citing AR 2571).

Defendant claims that the NNSA reasonably evaluated TUVA's direct labor rates. Def.'s Cross-Mot. & Resp. 26-30. Specifically, defendant notes that the NNSA (1) used several techniques to evaluate TUVA's direct labor rates; (2) appropriately considered TUVA's proposal to maintain [. . .]% of the incumbent staff since TUVA never proposed to retain those individuals at their incumbent salaries; and (3) properly evaluated the realism of TUVA's proposed direct labor rates in accordance with TUVA's proposal since TUVA proposed the retention of [. . .]% of NNSA's benchmark of [. . .] FTEs. Id. at 26-30.

In response to defendant's defense of the NNSA's analysis of TUVA's direct labor rates, SSI contends that the NNSA's methodology is "insufficient." Pl.'s Reply & Resp. 13. According to SSI, the NNSA's standard deviation analysis, which compared TUVA's average total direct labor rates with SSI's average total direct labor rates—for both management and nonmanagement positions—does not satisfy the requirements of FAR 15.404-1(d)(1). Id. at 13-14. Rather, SSI argues that the NNSA should have performed such an analysis for each labor category. Id. at 14. In addition, SSI claims that although the NNSA attempted to determine whether TUVA could retain at least [. . .]% of the incumbent personnel at its proposed direct labor rates, the NNSA "largely disregarded the results of its analysis." Id. In SSI's view, the NNSA's Revised IPT Report demonstrated that to reach [. . .]% retention, TUVA would have had to raise the rates for certain positions and lower the rates for others. Id. at 15. Thus, SSI contends, the NNSA should have made a "probable cost adjustment" to TUVA's proposal. Id. Finally, SSI claims that the NNSA failed to properly analyze TUVA's proposal with respect to retaining specific incumbent personnel at proposed rates. Id. at 16. In this regard, SSI claims that the NNSA should have conducted a proper cost realism analysis to determine whether TUVA's technical approach aligned with its cost proposal. Id. at 16-17.

In a final defense of the NNSA's analysis of TUVA's proposal to retain [. . .]% of the incumbent staff, defendant provides a detailed explanation of the NNSA's analysis. Def.'s Reply 10-13. According to defendant, for each of the [. . .] labor categories identified in TUVA's proposal, the NNSA "tested the feasibility of maintaining [. . .] incumbent employees by comparing (1) TUVA's proposed rate for each labor category in the Staffing Plan with (2) the incumbent rate for that category under multiple scenarios." Id. at 10 (citing AR 2573). In one scenario, the NNSA considered what would happen if TUVA did not retain any of the [. . .], thereby retaining [. . .] incumbents with [. . .] new hires. Id. The NNSA concluded that at this [. . .]% retention rate, there was no underbidding or lack of cost realism. Id. (citing AR 2573). In an alternative scenario, the NNSA considered what would happen if TUVA retained, in a given labor category, only those employees whose proposed direct labor rates were within [. . .]% of the incumbent's average rate in that category. Id. at 11 (citing AR 2573 and Tab 61). Pursuant to this scenario, the NNSA found that TUVA would not retain any [. . .], or [. . .], thereby retaining [. . .] incumbents with [. . .] new hires—a [. . .]% retention rate. Id. (citing AR 2573). Once more, the NNSA concluded that there was no lack of cost realism. Id. The NNSA "also determined that such a scenario presented low risks because if TUVA increased direct labor rates for [. . .] to incumbent rates, TUVA could likely meet its [. . .] percent retention goal at an increased cost of only $[. . .]—less than [. . .] percent of TUVA's proposed direct labor costs for one year." Id. (citing AR 2573). In response to SSI's argument that the NNSA should have determined whether, under TUVA's proposal, certain incumbent personnel could be retained, the agency contends that there was no need to do so since it had previously considered a scenario in which TUVA did not retain individuals whose rates were [. . .]% less than incumbent rates. Id.

Turning to the Revised IPT Report itself, the NNSA's detailed explanation of its evaluation of TUVA's direct labor rates amply demonstrates that its analysis was thorough and that its conclusions were rational. The NNSA's price analyst began by assessing how close TUVA's proposed direct labor costs were to its probable direct labor costs:

TUVA proposed $[. . .] in direct labor costs, which represents [. . .]% of the total proposed price.  TUVA estimated salaries by using [. . .].  DCAA verified the proposed non Service Contract Act (SCA) labor rates to labor rates in an updated salary ranges document prepared by the contractor and to actual salaries in payroll.  DCAA determined that proposed labor rates are within the [. . .].  The Government compared the proposed SCA labor category rates to the Department of Labor (DOL) Wage Determination No. 2005-2361, Revision 18, dated January 5, 2016 and all labor rates met or exceed SCA labor rates.  The analyst used Standard Deviation (SD) analysis and independent assessment to evaluate the realism of proposed labor rates. SD was calculated by isolating Management categories for all Offerors.  A second SD factor was also calculated for all other (non-management) average rates by offeror.  Applying the SD approach, the rates fall slightly outside one SD of the respective mean.  The variance for management labor does not result in underbidding.  The variance for 'other' categories is approximately 1% less than the SD range or 4% less than the mean.  Based on DCAA's review and the minimal variances disclosed in the SD analysis no apparent understatement of labor rates is found.  TUVA proposed [. . .]% annual escalation, which is in line with the market rate proposed by other contractors under this solicitation.  Escalation is proposed by program year.  The probable direct labor cost is the same as the proposed.

AR 2571.

Next, the NNSA's price analyst considered the viability of TUVA's promise to retain [. . .]% of the incumbent staff.  Id. at 2573.  First, she compared TUVA's and SSI's direct labor rates and found that "TUVA's average total rate was $[. . .] or [. . .]% less than SSI['s]."  Id.  Second, she isolated TUVA's direct labor rates for management from the average rates and found that TUVA's average total rate for management was "[. . .]% or $[. . .] higher" than SSI's and that TUVA's average total rate for nonmanagement was "within [. . .]%" of SSI's.  Id.  Third, she concluded that although TUVA's total proposed direct labor rate was [. . .]% lower than SSI's, the majority of the difference was attributable to the fact that TUVA proposed [. . .] direct productive labor hours per annum, while SSI proposed [. . .].  Id.  When the NNSA's price analyst adjusted TUVA's direct labor rate to reflect this difference, she concluded that TUVA's direct labor rate was [. . .]% higher than indicated in TUVA's FPR ($[. . .] vs. $[. . .]).  Id.  In other words, after she modified TUVA's cost proposal such that she was able to conduct a true comparison of TUVA's and SSI's direct labor rates, she found that TUVA's rates were [. . .]% higher.  Id.  However, she explained that she did not consider any further adjustment warranted because TUVA never claimed that it would retain 100% of the incumbent workforce.  Id.  The NNSA's price analyst further noted that if TUVA did retain certain individuals from the

-38-

incumbent workforce, NNSA was not required to pay 100% of their salaries.[11]  Id.

In addition to taking the above steps, because the NNSA's price analyst noticed that there were significant ranges within the incumbent rates for processors (between $17.50 and $49.96 per hour, for an average hourly rate of $21.39) and adjudication (between $24.50 and $49.93 per hour, for an average hourly rate of $30.22); and that lead positions could earn as much as double the amount paid entry level employees, she performed a separate analysis of each labor category. Id.  Noting that to satisfy its promise of [. . .]% retention, TUVA would have to retain [. . .] FTEs ([. . .]% of the incumbent's current staffing level of [. . .] FTEs),[12] she "noted that the Program Analyst's and lead positions would potentially be hard to maintain within budgeted costs while the remaining incumbent labor [was] feasible."  Id.  She then concluded that, if an adjustment was made to [. . .] by 6%, the proposal was realistic.  Id.  Lastly, the NNSA's price analyst concluded that there was "no evidence of underbidding" in TUVA's proposal.  Id.  As noted

---

[11]  In its opposition to SSI's motion for judgment on the administrative record, defendant relies on FirstLine Transportation Security, Inc. v. United States, 119 Fed. Cl. 116 (2014), in support of its argument that TUVA's proposal to retain [. . .]% of the incumbent labor force was reasonable:  "The agency considered the protester's argument, but determined that the compensation package described by the awardee, along with its independent consideration of employee retention rates at other airports, sufficiently mitigated the risk that the awardee would be unable to meet its retention plan."  Def.'s Cross-Mot. & Resp. 28 (citing FirstLine, 119 Fed. Cl. at 130).  SSI challenges defendant's reliance on FirstLine on the grounds that although the case involved an incumbent retention plan, it did not involve a cost realism analysis:  "Instead, the court's analysis [was] focused on the reasonableness of the agency's evaluation under two technical evaluation factors unrelated to cost or price."  Pl.'s Reply & Resp. 16.  In response, defendant notes that although the court in FirstLine did not specify whether the agency's analysis was conducted as part of a cost realism analysis, the rationale behind both is the same—"to ensure that an offeror's technical approach is feasible at the proposed cost."  Def.'s Reply 12.  The court agrees.  In FirstLine, the court held that the agency's evaluation of the successful offeror's employee retention plan was rational.  119 Fed. Cl. at 129.  Specifically, the court noted the agency considered all aspects of the awardee's plan, such as its compensation package, its employee incentive program, and comparable retention rates at other similar facilities:  "Rather, the administrative record demonstrates that [the agency] considered all aspects surrounding [the awardee's] proposed retention rate and still found no risk."  Id. at 130 (emphasis added).  Furthermore, although the words "cost" or "price" do not appear in the court's analysis, the court's description of the protester's arguments clearly references cost and price:  "According to Plaintiff, Akal will not be able to retain [* * *] percent of the existing workforce, because it proposed compensation packages to employees [that are] worth less than what FirstLine currently offers to its screeners. . . . [Plaintiff] argue[s] that wage and hour cuts 'materially impact morale and retention,' and it is patently irrational to conclude that these cuts can be mitigated by the strategies Akal proposed."  Id. at 129.  Thus, that the FirstLine court did not indicate that its review was a cost realism analysis is immaterial.  As defendant rightly contends, the purpose behind the agency's review was the same—to make sure the proposed workforce (one element of which is compensation) was capable of performing the contract.

[12]  In its FPR, TUVA proposed [. . .] FTEs.  AR 2573.

above, this conclusion was affirmed by the SSA in her February 23, 2017 Revised SSD.  See AR Tab 38 at 2611, 2618.  Thus, there is no evidence that NNSA's evaluation of TUVA's direct labor rates was anything other than rational.

### b.   The NNSA's Evaluation of TUVA's Indirect Rates Was Rational

Second, SSI contends that the NNSA erred in its consideration of TUVA's indirect labor rates, which includes fringe benefits, labor overhead, and general and administrative ("G&A") costs.  Pl.'s Mot. 26-27.  According to SSI, TUVA proposed a "robust and competitive benefits package," which included "[. . .]."  Id. at 26 (citing AR 1681-82, 1832, 1955-56).  SSI further notes that TUVA also promised to provide "[. . .]," all of which constitute additional indirect labor costs.  Id. (citing AR 1464, 2067).  Yet, SSI argues, TUVA only "proposed a fringe rate of [. . .]%, a labor overhead rate of [. . .]%, and a G&A rate of [. . .]%."  Id. (citing AR 1935).  Had the NNSA performed a proper cost realism analysis, SSI contends, it would have recognized that these rates were far too low to cover the benefits TUVA proposed in its proposal.  Id.  In SSI's view, the fact that these expenses were not discussed in the NNSA's Revised IPT Report renders it unreasonable.  Id. (citing AR 2571-72).

Defendant claims that the NNSA reasonably evaluated TUVA's indirect labor rates.  Def.'s Cross-Mot. & Resp. 30-31.  According to defendant, the NNSA's reliance on TUVA's explanation that it would have access to the resources of AKIMA, LLC, its parent company—thereby reducing TUVA's costs for [. . .]—was appropriate.  Id. at 30.  Defendant further contends that not only did outside information provided by the DCAA confirm the NNSA's conclusion that TUVA's indirect labor rates were reasonable, id. at 30 (citing AR 2571), but the GAO's review of the NNSA's cost analysis found "nothing objectionable," id. (citing AR 2961).

SSI challenges defendant's reliance on the DCAA's approval of TUVA's indirect labor rates.  Pl.'s Reply & Resp. 17.  According to SSI, the DCAA was not privy to TUVA's proposal and its conclusion was based on a comparison of TUVA's proposed indirect labor rates with TUVA's Forward Budget Submission.  Id. (citing AR 4513-14).  SSI further argues that in its reliance on the DCCA's analysis, the NNSA failed to conduct an independent evaluation of TUVA's indirect labor costs to determine whether they were reasonable.  Id. at 17-18.  Defendant replies by noting once more that the NNSA has broad discretion to rely on both TUVA's claim that it had access to the financial and administrative resources of its parent company and the DCAA's analysis.  Def.'s Reply 13-14.

The NNSA's conclusions that there was "no evidence of underbidding," AR 2571, and that TUVA's "proposed indirect rates [were] realistic and incorporated into the probable cost," id., were reasonable.  First, the NNSA noted that TUVA's proposed indirect labor costs of [. . .], which constituted [. . .]% of its total proposed price, was "based on FY16 budgeted rates adjusted for the impact of this contract."  AR 2571.  In addition, although the NNSA noted that the DCAA had determined, [. . .], it decided not to make an adjustment because "[. . .]."  Id.  Significantly, the NNSA further found that any variances between TUVA's proposed price and the probable cost was "due to a decreased base, which excludes Inquiries rounding amounts," id., amounts that the NNSA excluded from its probable cost figure because they were viewed as contingency fees, id. at 2573; see also id. at 2572-73 ("Inquiries estimated indirect rates using its

current business forecast.  The cost proposal narrative provides the previous 3 year actual rates. It should be noted that the actual experienced G&A rate for Inquiries is significantly higher than the proposed rate.  Inquiries' narrative cost proposal indicated that the rate is proposed as a ceiling or CAP rate.  If awarded TUVA should include the proposed ceiling of [. . .]% within Inquiries' contract.  Inquiries proposed a fee of [. . .]%.  The proposed cost summary includes a line for 'rounding from the summary sheet to the Prime.'  The rounding amounts total to over $[. . .].  The [government's probable cost] excludes this amount as it is considered a contingency. The [probable cost] for Inquiries results in a variance of $[. . .].").  The court cannot quarrel with the NNSA's exclusion of a contingency in its review of an offeror's proposal, as these amounts will necessarily vary from offeror to offeror and do not reflect probable costs to the government.

Next, as noted by the GAO in its review of SSI's protest, AR 2961, TUVA's proposal indicated that TUVA would have access to the resources of its parent company:

> TUVA has access to technical and administrative reach back to its parent company, AKIMA, LLC.  [. . .]  Additionally, we are able to offer lower indirect costs by virtue of a shared services platform that provides various management services directly to our company.

Id. 7.  While is not clear from TUVA's proposal what the dollar value of the various management services—to include [. . .], it was not unreasonable for the NNSA to take into account the resources of TUVA's parent company when assessing TUVA's proposed indirect labor costs.

Furthermore, given the NNSA's broad discretion in conducting a cost realism analysis in the context of a best value procurement, it is of no moment that the NNSA chose not to conduct its own evaluation of TUVA's indirect labor rates.  In addition, that the NNSA's conclusions regarding TUVA's indirect labor rates were in part based on information provided by the DCAA does not render those conclusions less valid.  Lastly, although the court notes that the GAO found "nothing objectionable" in the NNSA's cost analysis of TUVA's proposal, as the court stated above, it owes no deference to the findings of the GAO.  See Section III.B.2.a, supra.

### c.  The NNSA's Evaluation of TUVA's Staffing Plan Was Rational

Third, SSI advances a two-part argument in support of its contention that the NNSA's evaluation of TUVA's staffing plan was unreasonable.  Pl.'s Mot. 27-33.  Defendant counters that the NNSA's evaluation of TUVA's staffing plan was reasonable because TUVA's cost proposal was consistent with its staffing plan.  Def.'s Cross-Mot. & Resp. 31-35.

### i.  The NNSA Did Not Ignore any Risks Associated With TUVA's Staffing Plan

In the first part of its argument, SSI contends that, although the NNSA initially identified several problems with TUVA's staffing plan, it did not account for these deficiencies in its final assessment.  Pl.'s Mot. 27-29.  Specifically, SSI notes that the NNSA at first found that (1) TUVA "failed to assign job duties for some of the PBWS functions within the proposed labor

categories," AR 863; (2) TUVA "failed to assign job duties in four entire subsections within the PBWS," id.; (3) TUVA did not provide enough information for the NNSA to determine whether the total number of hours proposed, by labor category, were sufficient to complete the work described in the PBWS, id., and (4) there were material differences between TUVA's proposed cost and the IGCE, and between TUVA's total direct labor hours and the IGCE, id. at 864. SSI also notes that TUVA responded to these criticisms by making changes to its technical proposal, to include additions to its staffing plan narrative. Id. However, SSI claims, TUVA did not adjust its overall staffing plan or cost proposal. Pl.'s Mot. 27. In other words, SSI argues that although TUVA added tasks to various positions, it never adjusted the number of FTEs or direct labor hours required to perform that work and instead reduced its proposed price for work performed during the base year. Id. at 29. In SSI's view, the revisions TUVA made to its proposal actually increased the risks to the NNSA, risks the NNSA ignored in its evaluation of TUVA's FPR, thus rendering the NNSA's ultimate assessment of that proposal unreasonable. Id.

According to defendant, TUVA appropriately added information to its staffing plan regarding the job duties within certain labor categories or PBWS functions in response to the NNSA's comments. Def.'s Cross-Mot. & Resp. 31 (citing AR 1825-28). Defendant argues that the addition of this information did not require any further adjustment to TUVA's staffing plan because the NNSA became satisfied that "employees were assigned to all PBWS functions." Id. (citing AR 2550). In addition, defendant notes that although SSI responded to the same critique from the NNSA by not only supplementing its staffing plan narrative but also by adding two FTEs to Processing and removing two FTEs from Adjudication in its FPR, TUVA had no obligation to do the same. Id. (citing AR 1147). Defendant further claims that the reason why the NNSA was not concerned with the "minor cost reduction" in TUVA's FPR was because TUVA explained that the reduction was due to a change in TUVA's indirect rates since the submission of its first proposal: "TUVA's final proposal revision indicates that the reduction merely reflects changes to indirect rates (e.g. [. . .]) given the passage of time since the submission of its first proposal; the proposed labor hours and rates remained the same." Id. at 32 (citing AR 744, 1962). Lastly, defendant contends that SSI "identifies nothing irrational about [the NNSA's] determination that the efficiencies in TUVA's staffing plan would allow it to complete the scope of work within [fewer] labor hours than anticipated in the IGCE." Id. at 32. According to defendant, SSI "is currently performing the contract with [. . .] [fewer] FTEs than TUVA proposes." Id. (citing AR 2573).

In its reply, SSI claims that the NNSA failed to recognize that it was obliged to consider the staffing plan in TUVA's technical proposal as well as the staffing plan in TUVA's cost proposal.[13] Pl.'s Reply & Resp. 18. According to SSI, although TUVA made changes to the

---

[13] Although SSI suggests, in its reply, that there are two staffing plans—one in TUVA's technical proposal and one in TUVA's cost proposal, the court finds no support in the administrative record for this claim. As noted in the NNSA's September 28, 2016 SSD, the IPT initially evaluated the four proposals within the competitive range pursuant to the four criteria listed in the RFP: technical approach, staffing plan and program manager qualifications, corporate experience, and past performance. AR 2263. Then, the IPT evaluated the cost of the offerors' proposals, noting that "[w]hen combined, the four criteria are significantly more important than Cost; however, cost/price will contribute substantially to the selection decision."

staffing plan in its technical proposal, no changes were made to the staffing plan in its cost proposal.  Id. at 18-19.  In addition, SSI claims that the NNSA failed to consider the effect that changes to TUVA's technical proposal would have on TUVA's cost proposal.  Id. at 19.  In SSI's view, "TUVA proposed to do substantially more work with the same number of FTEs, using the same number of hours, at a slightly lower price," and the "NNSA accepted this without question, disregarding the risks that it had previously assigned."  Id. at 20.

In its own reply, defendant claims that SSI waived its right to challenge the NNSA's evaluation of TUVA's technical proposal with respect to Criterion 2 (Staffing Plan and Program Manager Qualifications).  Def.'s Reply 14-16.  Specifically, defendant argues that SSI's complaint contains no such allegation and SSI cannot raise an allegation for the first time in its reply brief.  Id. at 15 ("Furthermore, defendant contends that SSI mistakenly assumes that "additional detail regarding the tasks assigned to a labor category constitutes additional duties.").

SSI did not, in its complaint, assert any allegations related to the NNSA's assessment of TUVA's staffing plan.  Therefore, as defendant rightly contends, SSI cannot make the argument for the first time in its reply brief.  See Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").  Even if SSI had not waived the argument, however, it still lacks merit.

TUVA's augmentation of its staffing plan in its FPR to include additional information, coupled with TUVA's explanation of the decrease in its indirect labor rates and the NNSA's rational assessment of the number of FTEs required to perform the contract, confirm that the NNSA did not ignore any risks in its assessment of TUVA's plan.  First, in its FPR, TUVA responded to the NNSA's concerns regarding its staffing plan by refining its descriptions of each of the proposed labor categories and providing more information regarding the duties of each of the positions.  See AR 1825-29.  For example, TUVA made the following modifications—a strikeout indicates material that was removed and an underline indicates material that was added—to the Program Analyst III labor category:

> **Program Analyst (PA) III** - (PBWS 4.1.2) Team TUVA proposes
> [. . .].

Id. at 1825.  TUVA then added the following information to its description of the duties of the PA III position:

> **Job Duties**
>
> • Utilize database report generating software and programs •
> Research, analyze, and evaluate complex data and review budget
> data • Perform supervisory and liaison functions and duties

---

Id.  TUVA's FPR only contains one staffing plan, which is described in its technical proposal and valued in its cost proposal.

> between subordinate employees and between contractor and
> government • Interact with multiple levels of management •
> Manage customer and contractor relationships and support
> multiple projects • <u>Update database records of budget information
> regarding initial investigations and reinvestigations • Extract data
> to prepare budget, statistics, management, survey/inspection,
> reconciliation and ad hoc reports • Administer and maintain a
> clearance action tracking system sufficient to identify specific
> clearance activities and time lines of clearance requests, such as to
> accurately and timely identify the nature of clearance requests
> received, status, and completion of personnel security clearance
> and adjudication activities and actions</u>

<u>Id.</u> TUVA made similar changes and additions to a total of eighteen labor categories and corresponding job duties. <u>Id.</u> at 1825-29.

Second, given TUVA's explanation for the decrease in its indirect labor costs, the fact that TUVA proposed a price reduction does not, as SSI asserts, "def[y] realism." Pl.'s Mot. 29.

Third, although SSI claims that "TUVA added numerous tasks to a given position but did not adjust the number of FTEs or the number of direct labor hours required to perform the work," <u>id.</u>, SSI has not demonstrated that the duties added would result in additional work and were not simply the identification of tasks already assigned or expected of employees working within those labor categories. In other words, SSI has not provided the court with any evidence that, for example, the addition of the obligation to "[u]pdate database records of budget information regarding initial investigations and reinvestigations" to the job duties of the PA III position was intended to describe a responsibility separate and apart from the already listed duties to "[u]tilize database report generating software and programs" and "[r]esearch, analyze, and evaluate complex data and review budget data." AR 1825.

Finally, defendant is correct in its assertion that SSI fails to identify anything irrational regarding the NNSA's conclusion that TUVA's staffing plan, as configured, is efficient enough to permit the performance of the contract with fewer labor hours than contemplated by the IGCE. Rather, the fact that SSI is currently performing the contract with [. . .] fewer FTEs than TUVA proposes in its FPR directly supports the rationality of the NNSA's conclusion. <u>See</u> AR 2573 ("TUVA proposed [. . .] FTEs and the incumbent's current staffing level is [. . .] FTEs.").

### ii. Although the NNSA's Evaluation of TUVA's Staffing Plan Contained a Typographical Error, the NNSA Did Not Misread the Plan

In addition to arguing that the NNSA ignored risks associated with TUVA's staffing plan, SSI argues that the NNSA misread the plan. Pl.'s Mot. 30-33. According to SSI, in its Revised IPT Report, the NNSA states:

> SAVA's cost proposal includes [. . .] FTEs listed as Personnel
> Security Clearance Processing Team Leads. The 'team lead'

portion is a typo.  The rate for this category is equivalent to the Personnel Security Clearance Processor.  Additionally, the staffing plan confirms this typo as it lists [. . .] team lead FTEs and [. . .] processor FTEs.  The typo does not impact cost, as the correct rate was used in the calculation of direct labor.

Id. at 30 (quoting AR 2571-72).  SSI contends, however, that the NNSA's statements and conclusions are not supported by TUVA's proposal.  Id.

First, SSI asserts that SAVA did not propose [. . .] Personnel Security Clearance Processing TLs in its cost proposal.  Id. (citing AR 2114).  According to SSI, the Personnel Security Clearance Processing TL position is neither listed in SAVA's cost proposal, id. at 30 (citing AR 2114), nor listed in SAVA's staffing plan, id. (citing AR 1905).  SSI further avers that although SAVA did not propose any positions with equivalent rates, id., the NNSA erroneously adjusted TUVA's proposed cost to reflect such rates, id. at 30-31 (citing AR 2571-72).

Second, SSI claims that the following table, which appears in Attachment 3 to the NNSA's Revised IPT Report, misstates TUVA's staffing plan.  Id. at 31-33.

### Technical Evaluation of the Cost Proposal

| Categories | Percentage Provided | % of FTEs[14] | TUVA's Proposed FTEs |
|---|---|---|---|
| Adjudication | 26% | [. . .] | [. . .] |
| Administrative | 11% | [. . .] | [. . .] |
| Processors | 41% | [. . .] | [. . .] |
| Professional / Executive Administrative | 9% | [. . .] | [. . .] |
| FOCI | 5% | [. . .] | [. . .] |
| Vault | 8% | [. . .] | [. . .] |
| TOTAL | | [. . .] | [. . .] |

AR 2607 (footnote added).  According to SSI, the figures used by the NNSA in the table are not an accurate representation of those provided by TUVA.  Pl.'s Mot. 32.  SSI identifies the following discrepancies:  (1) the NNSA lists [. . .] FTEs in Adjudication whereas TUVA lists [. . .], and (2) the NNSA lists [. . .] FTEs in Processing whereas TUVA lists [. . .].  Id. (comparing AR 2607 (Attachment 3) with AR 1714).

---

[14]  Although the heading states that the numbers in the third column are percentages, they are in fact numbers—specifically, the number of FTEs that an offeror would have to allocate to each of the six skill set categories to satisfy historical allocations, as represented by the percentages listed in the second column.

In response to SSI's arguments, defendant concedes that the Revised IPT Report contains a typographical error in that the NNSA erroneously stated that SAVA's cost proposal listed [. . .] FTEs as "Personnel Security Clearance Processing Team Leads" when it actually only listed "Personnel Security Clearance Processors." Def.'s Cross-Mot. & Resp. 32.  However, defendant claims that the NNSA never relied on the misimpression and therefore SSI was not prejudiced by the NNSA's mistake. Id. (citing AR 2571-72, 4520-22).  Next, defendant contends that the table is a comparison of the skill mix in TUVA's staffing plan with historical values:

> The first two columns show the skill set category and the historical percentage of work associated with each category indicated in the Q&A.  . . .  The third column shows the allocation of the offerors' proposed FTEs based on the historical percentage.  . . .  The fourth column shows the allocation of the offerors' FTEs based on their proposed staffing plans.

Id. at 33.  Thus, defendant argues:  "The comparison provided by [SSI] reflects no discrepancy because the staffing plan attachments provide 4 PBWS staffing areas and the Q&A identified 6 skill sets, so the table in Attachment 3 does not reflect an apples-to-apples comparison."  Id. Defendant then illustrates its point:

> For instance, [SSI] notes that "Attachment 3 lists [. . .] FTEs in Adjudication.  TUVA's Staffing Plan lists [. . .] FTEs."  . . .  But [SSI] ignores the actual, substantive descriptions of the job categories contained in the Staffing Narrative.  For instance, TUVA's staffing matrix shows [. . .] Personnel Security Specialist (PSS) [TL] IIIs under "Program Management" and another [. . .] PSS [TL] IIIs under "Adjudication."  . . .  TUVA's Staffing Plan Narrative explains that all [. . .] PSS III TLs support the Adjudication work.  . . .  The staffing matrix also shows an administrative assistant under Adjudication, which NNSA included in the "Administrative" category for the purposes of Attachment 3. Accordingly, the Staffing Plan indicates that [. . .] FTEs listed under "Program Management" and [. . .] FTEs listed under "Adjudication" will support the Adjudication work.  Thus, Attachment 3 correctly shows [. . .] FTEs assigned to Adjudication.

Id. at 33-34.  Defendant further notes that SSI's staffing matrix was treated in the exact same fashion.  Id. at 34.

Defendant concludes by claiming that the NNSA's "comparison of the labor mix against the historical estimates was simply another evaluation technique to identify any significant issues with the proposed staffing plan," id., and that "[u]ltimately, the agency determined that both offerors' reflected the appropriate skill mix in the appropriate labor categories," id. (citing AR 2607, 2609).

In its reply, SSI disputes defendant's claim that the NNSA was responsible for the typographical error.  Pl.'s Reply & Resp. 20.  According to SSI, "[t]he paragraph of the Revised IPT Report in question discusses Personnel Security Clearance Processing [TLs] and whether or not the position should be listed as a [TL]."  Id. at 21.  In addition, SSI disputes the NNSA's explanation as to how it compared each offeror's staffing plan to historical allocations of labor.  Id. at 21-22.  According to SSI, the "NNSA should not have required offerors to allocate personnel into four categories" if it wanted them to use the six historical categories.  Id. at 21.  SSI also argues that the NNSA should not have mechanically used its own estimates for labor or costs as a means of evaluating an offeror's staffing plan.  Id. at 21-22.

Defendant counters SSI's restatement of its arguments by noting once more that the NNSA's typographical error had no bearing on its analysis.  Def.'s Reply 16.  Defendant also disputes SSI's claim that the NNSA made a "mechanical adjustment" to TUVA's staffing plan to compare it to the six categories reflected in the historical allocation that was provided to the offerors in the RFP Q&A.  Id. at 16-17.  According to defendant, the NNSA never concluded that a "specific number of employees was necessary to perform the requirements," nor did the NNSA "impose a Government estimate to determine whether the staffing was 'acceptable or unacceptable.'"  Id. at 17.  Defendant also reiterates the fact that the NNSA ultimately concluded that both TUVA and SSI proposed appropriate skill mixes in the appropriate labor categories.  Id.

First, the court concludes that the NNSA's Revised IPT Report does, as defendant concedes, incorrectly state that SAVA's cost proposal listed [. . .] FTEs as "Personnel Security Clearance Processing Team Lead[s]."  See AR 1714.  SAVA's proposal only listed [. . .] FTEs as "Personnel Security Clearance Processor[s]."  See id. at 1732.

Second, the court concludes that the NNSA did not misstate TUVA's staffing plan.  The table reproduced above is not a summary of TUVA's staffing plan for the base year.  It is instead an evaluation of that plan derived from the NNSA's comparison of TUVA's proposed FTEs to historic work allocations based on the percentage of work performed in six categories.  Furthermore, the offerors were informed of the percentage estimates the NNSA would use in its analysis of each of the six required skill sets in the RFP's Q&A.  See id. at 214, 2938-39.  Thus, SSI knew in advance of submitting its proposal that the NNSA would be using historical figures to review the offerors' staffing plans.  Lastly, although somewhat convoluted, defendant's explanation does demonstrate that—as defendant contends—the NNSA's table was not meant to be a simple reproduction of TUVA's staffing plan.

The following table represents TUVA's proposed staffing plan with the modifications made by the NNSA for use in its technical evaluation:

| AREA | Total FTEs |
|---|---|
| **Program Management** | |
| Program Manager | [. . .] |
| Personnel Security Specialist TL / III | [. . .] |
| Program Analyst III | [. . .] |
| Program Analyst II | [. . .] |

| | |
|---|---|
| Program Analyst I | [. . .] |
| Personnel Security Clearance Processing TL | [. . .] |
| **Subtotal** | [. . .] |
| | |
| **Processing** | |
| Administrative Review Technician | [. . .] |
| Senior Personnel Security Clearance Processor | [. . .] |
| Personnel Security Clearance Processor | [. . .] |
| Quality Assurance  / Customer Service Processor | [. . .] |
| Mail Clerk | [. . .] |
| Lead Vault Clerk | [. . .] |
| Vault Clerk | [. . .] |
| Administrative Assistant | [. . .] |
| **Subtotal** | [. . .] |
| | |
| **Adjudication** | |
| Personnel Security Specialist TL / III | [. . .] |
| Personnel Security Specialist II | [. . .] |
| Personnel Security Specialist I | [. . .] |
| Administrative Assistant | [. . .] |
| **Subtotal** | [. . .] |
| | |
| **Foreign Ownership, Control or Influence** | |
| Security Specialist | [. . .] |
| Security Assistant | [. . .] |
| **Subtotal** | [. . .] |
| | |
| **Total All** | [. . .] |

Id. at 1714.  Under "Program Management," TUVA listed [. . .] PSS TL IIIs.  Id.  Because the staffing plan's narrative section stated that these positions support adjudication work and because TUVA's staffing plan listed an additional [. . .] PSS TL IIIs under "Adjudication," the NNSA combined the listings under "Adjudication."  Id.  Thus, (1) [. . .] PSS TL IIIs were subtracted from "Program Management," reducing the total number of FTEs in that category from [. . .] to [. . .], and (2) [. . .] PSS TL IIIs were added to "Adjudication," increasing the total number of PSS TL IIIs from [. . .] to [. . .] and increasing the total number of FTEs in that category from [. . .] to [. . .].  Next, because TUVA's plan listed an Administrative Assistant under both "Adjudication," and "Processing," the NNSA combined the listings under "Processing."  Thus, [. . .] Administrative Assistant was subtracted from "Adjudication," [. . .] the total number of FTEs in that category from [. . .] to [. . .], and (2) [. . .] Administrative Assistant was added to "Processing," increasing the total number of FTEs in that category from [. . .] to [. . .].  Id.; see also id. at 2939 ("The comparison was done to identify potential problems with the proposed staffing plan, not if the staffing plan was an exact match to the historic percentages provided. Therefore, looking simply at the Staffing Plan for either offeror under the heading of 'Processing' would not be reflective of what is in the Government[']s comparison table.").

Finally, because the NNSA analyzed TUVA's and SSI's staffing plans in the same fashion, SSI cannot claim to have been prejudiced in this regard.  See id. at 2938 ("The Agency evaluated the actual staffing plan proposed by both TUVA, LLC (TUVA) and Synergy Solutions, Inc. (SSI).  The Agency did not modify, adjust, or alter the staffing plans for the purposes of evaluation."), 2939 ("No adjustments were made to either offeror's proposal as none were needed, they both proposed a reasonable and realistic amount of FTEs under each labor category."), 2940 ("The Government applied the same comparison to SSI's cost proposal using [. . .] for the total number of FTEs proposed.").

### d.  The NNSA Rationally Concluded That TUVA Could Meet the Technical Requirements

Fourth, SSI argues that the NNSA erroneously concluded that TUVA was capable of meeting the RFP's technical requirements.  Pl.'s Mot. 33-34.  Specifically, SSI contends that the NNSA should have recognized that TUVA's proposal contained insufficient FTEs or labor hours.  Id. at 33.  According to SSI, TUVA proposed [. . .] direct labor hours for the entire contract, which included [. . .] labor hours for the base period.  Id. (citing AR 1714, 1744).  By comparison, SSI claims that it proposed [. . .] hours for the entire contract, which included [. . .] hours for the base period.  Id. (citing AR 1389).  In addition, SSI avers that although the NNSA acknowledged that TUVA proposed fewer hours than the IGCE and SSI, it nevertheless concluded that TUVA's proposed hours and FTEs were sufficient.  Id. (citing AR 2570-71).  SSI argues that TUVA's technical approach would not enable it to perform the NNSA's requirements with so few FTEs and labor hours and that the NNSA failed to adequately explain its contrary finding.  Id. at 34.

Defendant claims that the NNSA reasonably concluded that TUVA's proposal to staff fifty-five FTEs—as compared to SSI's "staffing of the incumbent contract with [. . .] FTEs,"—was sufficient to meet the PBWS's technical requirements.  Def.'s Cross-Mot. & Resp. 35 (citing AR 2546-54).  Defendant further claims that the NNSA's conclusion is supported by "a thorough evaluation of TUVA's technical approach including its staffing plan, which NNSA determined was superior to [SSI's]."  Id.

In its reply, SSI maintains that the NNSA's cost realism analysis was unreasonable and that it is of no moment that SSI is currently performing the contract with [. . .] FTEs as opposed to the fifty-five FTEs TUVA proposes.[15]  Id. at 23.  SSI further claims that, but for a delay in obtaining security clearances for its employees, it would have more FTEs working on the contract.  Id.  In addition, SSI states that the solicited contract contains more requirements than the incumbent contract as a result of HSPD-12, and that therefore defendant's comparison of TUVA's proposal with SSI's incumbent staffing levels is unavailing.  Id.  Lastly, SSI complains that the NNSA's Revised IPT Report lacks any meaningful analysis.  Id.  Specifically, SSI claims that nowhere in the report does the NNSA discuss the number of hours proposed for each position, the number of hours proposed for a given contract period, the number of FTEs TUVA proposed, or the number of FTEs assigned to a particular labor category—all of which SSI

---

[15]  According to SSI, it currently has [. . .] FTEs on the contract, not [. . .] as defendant claims.  Pl.'s Reply & Resp. 23.  Assuming plaintiff is correct, the court's analysis and ultimate holding remains unchanged.

claims is necessary for the analysis to be meaningful.  Id.  Because the NNSA failed to conduct such analysis, SSI contends, TUVA wrongly received an "Excellent" rating for Criterion 2.  Id. at 24.

     According to defendant, the NNSA's analysis, which included "(1) comparing TUVA's proposed labor allocation to historic allocations, (2) verifying that all tasks in the [PBWS] were assigned to labor categories, and (3) comparing TUVA's proposed staff of [. . .] employees to historic staffing ranges," satisfied both FAR and RFP requirements.  Def.'s Reply 17-19. Furthermore, in response to what it characterizes as two new arguments, defendant contends that the NNSA did consider the additional duties imposed by HSPD-12 because TUVA's FPR not only assigned HSPD-12 tasks to [. . .] of its Program Analyst II positions and to its staff of [. . .] Personnel Security Clearance Processors, but TUVA provided the NNSA with additional explanation regarding those assignments.  Id. at 18.  Next, defendant once more emphasizes that the NNSA's conclusion that TUVA could adequately perform the contract with [. . .] FTEs was reasonable given the fact that SSI was currently doing the job with only [. . .] FTEs.  Id.  In addition, defendant argues that SSI cannot, for the first time in its reply brief, claim that because the agency failed to adequately address the inherent risks in TUVA's staffing plan, TUVA should not have received a rating of "Excellent" for Criterion 2.  Id. at 19.  Finally, defendant notes that SSI fails to recognize TUVA's other significant strengths in Criterion 2, such as "its [PM] Manager, assignment of staff to 'Other Services,' and travel interview strategy."  Id. (citing AR 2547-48).

     The NNSA's conclusion that TUVA's proposal satisfied Criterion 2 was reasonable. That the NNSA's decision was based, in part, on its determination that a staffing plan with fewer FTEs than proposed by SSI was acceptable does not render its decision irrational.  Furthermore, the NNSA provided an extremely detailed explanation as to why it arrived at its decision.  In its Revised IPT Report, the NNSA provides an eight-page narrative-rich explanation as to why TUVA received a rating of "Excellent" for Criterion 2.  See AR 2546-54.  First, the NNSA described how it would evaluate TUVA's staffing plan:

> The Government will evaluate the Offeror's Staffing Plan to determine the degree to which the proposed staffing levels and skill mix are likely to result in efficient and successful performance of the PBWS.  Additionally, the Offeror's approach to staffing during workload fluctuations will be evaluated to determine the degree to which the approach is likely to result in continuity and successful accomplishment of the PBWS during workload fluctuation periods.

Id. at 2546.  Then, in its evaluation, the NNSA provided a detailed explanation as to why the staffing plan was assessed as having two significant strengths and two strengths.  Id. at 2547-49. The NNSA also explained, in nine separate comments, why it no longer found that TUVA's staffing plan suffered from nine weaknesses.  Id. at 2550-54.

Second, the NNSA explained how it would evaluate TUVA's PM qualifications:

> The Government will evaluate the extent to which the proposed [PM] possesses the education and relevant experience to effectively execute the duties and responsibilities of the [PM] considering the nature, size and scope of the work required in the PBWS, including consideration of the Minimum Personnel Qualifications for the [PM] position at Section J, Attachment 6. The Incumbent must possess a Bachelor's degree in Business Administration/Management. A Bachelor['s] degree in any other discipline may be substituted with five years work experience as a Manager in a comparable assignment. Ten years of experience and a comparable assignment in Safeguards and Security may be substituted for the degree and must include three years of experience managing a Safeguards and Security Program at the second tier or higher level with a strong background in Personnel Security. The resume of the proposed [PM], without the documentation required in provision L.23(b)(2)(B) (if not currently employed by the Offerer), will be evaluated; however, the omitted documentation (letter of intent) will be noted as a performance risk.

Id. at 2546. Then, the NNSA provided a detailed explanation as to why TUVA's proposal was assessed as having one significant strength in this area. Id. at 2548-49. In light of the NNSA's extensive, reasoned analysis, SSI fails to demonstrate that the NNSA's evaluation of TUVA's proposed staffing plan was in any way irrational.

### 4. SSI Fails to Establish That but for the NNSA's "Mistakes," SSI Would Have Been Awarded the Contract

SSI's final contention is that but for the "mistakes" the NNSA made in its assessment of TUVA's proposal, SSI would have been awarded the contract. Pl.'s Mot. 35. The court has already concluded that the NNSA's evaluation of TUVA's proposal was, for the most part, rational, and to the extent that the NNSA erred, SSI was not prejudiced by the error. However, for the sake of completeness, the court addresses SSI's argument. According to SSI: (1) only SSI and TUVA were deemed technically acceptable by the NNSA, id. (citing AR 2534); (2) the SSA deemed SSI's proposal superior in two of the four technical evaluation criteria, id. (citing id. at 2618-19); (3) if the NNSA's errors with respect to TUVA's ratings were corrected, the SSA's decision would change, id.; and (4) even though TUVA's evaluated probable cost was [. . .] million less than SSI's, if the NNSA's cost realism analysis were corrected in the manner suggested by SSI, the result would be an upward adjustment to TUVA's probable cost coupled with a finding by the NNSA that TUVA lacked a sufficient understanding of the contract's requirements, id.

Defendant argues that SSI cannot succeed in its protest because it fails to demonstrate that but for the NNSA's purported errors, SSI would have been awarded the contract. Def.'s

Cross-Mot. & Resp. 35-39. According to defendant, even if the court accepted SSI's allegations with respect to Criterion 2 (Staffing Plan and Program Manager Qualifications), Criterion 3 (Corporate Experience), and Criterion 4 (Past Performance), the NNSA would still have concluded that TUVA's proposal was superior with respect to the two most important criteria— Criterion 1 (Technical Approach) and Criterion 2 (Staffing Plan and Program Manager Qualifications). Id. at 36-38. In the same vein, defendant contends that even if the court accepted SSI's claim that the NNSA's cost realism analysis was flawed, and even if adjustments were made to TUVA's labor rates, TUVA's proposal would still be less expensive than SSI's. Id. at 38-39. In defendant's view, even if all of SSI's recommendations were adopted, "TUVA's proposal would remain technically superior and less expensive." Id. at 39 (citing AR 2619).

SSI disputes defendant's argument that even if the court accepted all of SSI's claims, TUVA would still have been awarded the contract. Pl.'s Reply & Resp. 24-27. According to SSI, the fact that the instant procurement called for a best value trade-off meant that SSI had a substantial chance of being awarded the contract but for the NNSA's errors. Id. at 25. Specifically, SSI argues that "[w]here, as here, the agency is required to conduct a best value tradeoff . . . and an agency's reevaluation of proposals would lead to new ratings in multiple categories, the source selection authority should be required to redo the best value tradeoffs based on the new ratings and the evaluation scheme." Id. In addition, SSI claims that defendant fails to grasp that SSI is challenging the NNSA's entire cost realism analysis, not just its acceptance of TUVA's probable cost estimate. Id. at 25-26. SSI concludes that if all of the procurement errors were corrected, the change in SSI's and TUVA's respective ratings would be dramatic, thus demonstrating the significant prejudice SSI suffered. Id. at 26-27.

In its reply, defendant again claims that even if it accepted all of SSI's allegations, no further trade-off would be merited because "TUVA would remain lower in price and superior in merit." Def.'s Reply 19. In addition, defendant notes that although SSI claims to challenge the entire cost realism analysis, its primary argument relates to TUVA's proposal to retain [. . .] of SSI's incumbent staff at certain rates. Defendant then responds to that argument by stating that even if the NNSA were to increase TUVA's rates to match SSI's, TUVA would still have the lower-cost proposal. Id. at 20 (citing AR 2573).

As noted above, in addition to demonstrating that the NNSA's decision either lacked a rational basis or that the procurement process violated a regulation or procedure, SSI must demonstrate that it was prejudiced by the NNSA's errors. Thus, SSI must show that but for the NNSA's actions, it would have been awarded the contract. As defendant's argument demonstrates, SSI has not met its burden. First, SSI does not claim that the NNSA's evaluation of the most important criterion—Criterion 1 (Technical Approach)—was flawed. TUVA's proposal was rated "Excellent" in that category while SSI's proposal was only rated "Good."

Second, although SSI contests its receipt of a "Satisfactory" rating with respect to Criterion 2 (Staffing Plan and Program Manager Qualifications) and also claims that the NNSA's evaluation of TUVA's proposal pursuant to Criterion 3 (Corporate Experience) and Criterion 4 (Past Performance) was irrational, SSI has not shown that but for this determination SSI would have been awarded the contract. In other words, SSI's argument that it would have been awarded the contract if (1) it had received a higher rating with respect to Criterion 2 and (2)

TUVA had received lower ratings with respect to Criterion 3 and Criterion 4, is based on mere conjecture and supposition, rather than concrete evidence. As such, it is unpersuasive. See Glenn Def. Marine (ASIA), 720 F.3d at 912 ("[Plaintiff-Appellant] does not provide anything but conjecture that even with a 'Satisfactory' rating it would have had a substantial chance of prevailing in the bid. The Court of Federal Claims did not clearly err in finding that [Plaintiff-Appellant] had not shown prejudice from being rated 'Less than Satisfactory' rather than 'Satisfactory.'").

Finally, even if the court elevates cost over technical criteria, and accepts SSI's argument that TUVA's proposed labor rates were too low and therefore unrealistic—which the court does not—SSI's proposed price would remain significantly higher than TUVA's proposed price. In its analysis, the NNSA increased TUVA's nonmanagement labor rates by [. . .]%, which increased the cost of TUVA's overall proposal by [. . .]%. See AR 2573. Even with this adjustment, however, SSI's proposed price of $28.6 million was still more than 14% higher than TUVA's adjusted proposed price of $24.99 million. See id. at 2619.

## C. SSI Is Not Entitled to Injunctive Relief

In this case, SSI fails to demonstrate that the NNSA's decision to award TUVA the contract was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. of Am., 365 F.3d at 1350. In other words, SSI has not succeeded on the merits of its protest. Thus, the court need not, and will not, consider whether SSI has satisfied the other factors for obtaining injunctive relief: (1) "whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; [(2)] whether the balance of hardships to the respective parties favors the grant of injunctive relief; and [(3)] whether it is in the public interest to grant injunctive relief." PGBA, LLC, 389 F.3d at 1228-29.

## IV. CONCLUSION

The court has considered all of the parties' arguments. To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

In sum, SSI has failed to carry its burden of showing that the NNSA's decision to award the contract to TUVA was arbitrary, capricious, or contrary to law. Therefore, the court **DENIES** SSI's motion for judgment on the administrative record, and **GRANTS** defendant's cross-motion for judgment on the administrative record. No costs. The clerk is directed to enter judgment accordingly.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **no later than September 26, 2017,** the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge